IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3-09-CV 0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § | |
| Defendants. | § § | |

**APPENDIX TO**
**EXAMINER'S REPORT AND RECOMMENDATIONS NO. 8**
**AND REQUEST FOR STATUS CONFERENCE**
(Prosecution of Third Party Class Actions and Related Litigation)

John J. Little, Examiner, respectfully submits his Appendix to his Report and Recommendations No. 8. Included in this Appendix are the following:

| Ex. | Description | App. Page Nos. |
|---|---|---|
| A | Majority Opinion<br>*Chadbourne & Parke, LLP v. Troice*, 571 U.S. ____,<br>134 S. Ct. 1058 (2014) | 4-25 |
| B | Concurring Opinion<br>*Chadbourne & Parke, LLP v. Troice*, 571 U.S. ____,<br>134 S. Ct. 1058, 1072 (2014) | 27-28 |
| C | Dissent<br>*Chadbourne & Parke, LLP v. Troice*, 571 U.S. ____,<br>134 S. Ct. 1058, 1072 (2014) | 30-47 |

March 11, 2014

Respectfully submitted,


_____/s/ John J. Little_____
John J. Little
Tex. Bar No. 12424230
jlittle@lpf-law.com

LITTLE PEDERSEN FANKHAUSER, LLP
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573-2300
(214) 573-2323 [FAX]


## CERTIFICATE OF SERVICE

On March 11, 2014, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ John J. Little

**APPENDIX TO
EXAMINER'S REPORT AND RECOMMENDATIONS NO. 8
AND REQUEST FOR STATUS CONFERENCE
(Prosecution of Third Party Class Actions and Related Litigation)**

# Exhibit A

## Majority Opinion

*Chadbourne & Parke, LLP v. Troice*, 571 U.S. _____,
134 S. Ct. 1058 (2014)

(Slip Opinion)          OCTOBER TERM, 2013          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHADBOURNE & PARKE LLP *v.* TROICE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 12–79.  Argued October 7, 2013—Decided February 26, 2014*

The Securities Litigation Uniform Standards Act of 1998 (Litigation Act or Act) forbids the bringing of large securities class actions "based upon the statutory or common law of any State" in which the plaintiffs allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security," 15 U. S. C. §78bb(f)(1). The Act defines "covered security" to include, as relevant here, only securities traded on a national exchange. §§78bb(f)(5)(E), 77r(b)(1).

Four sets of plaintiffs, respondents here, filed civil class actions under state law, contending that the defendants, petitioners here, helped Allen Stanford and his companies perpetrate a Ponzi scheme by falsely representing that uncovered securities (certificates of deposit in Stanford International Bank) that plaintiffs were purchasing were backed by covered securities. The District Court dismissed each case under the Litigation Act. Although the certificates of deposit were not covered securities, the court concluded, the Bank's misrepresentation that its holdings in covered securities made investments in its uncovered securities more secure provided the requisite "connection" (under the Litigation Act) between the plaintiffs' state-law actions and transactions in covered securities. The Fifth Circuit reversed, concluding that the falsehoods about the Bank's holdings in covered securities were too tangentially related to the fraud to trigger the Litigation Act.

*Held*: The Litigation Act does not preclude the plaintiffs' state-law class

---

*Together with No. 12–86, *Willis of Colorado Inc. et al.* v. *Troice et al.,* and No. 12–88, *Proskauer Rose LLP* v. *Troice et al.,* also on certiorari to the same court.

2            CHADBOURNE & PARKE LLP *v.* TROICE

Syllabus

actions. Pp. 8–19.

(a) Several factors support the conclusion that the scope of §78bb(f)(1)(A)'s phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" does not extend further than misrepresentations that are material to the decision by one or more individuals (other than the fraudster) to purchase or sell a covered security.  First, this interpretation is consistent with the Act's basic focus on transactions in covered, not uncovered, securities.  Second, the interpretation is supported by the Act's language.  The phrase "material fact in connection with the purchase or sale" suggests a connection that matters.  And a connection matters where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security, not an uncovered one, something about which the Act expresses no concern.  See *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U. S. ___, ___.  Further, for the connection to matter, the "someone" making the decision to purchase or sell a covered security must be a party other than the fraudster.  Third, the securities cases in which this Court has found a fraud to be "in connection with" a purchase or sale of a security, under both the Litigation Act and Section 10(b) of the Securities Exchange Act of 1934 (which also uses the "in connection with" phrase), have involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained an ownership interest in financial instruments that fall within the relevant statutory definition.  See, *e.g., Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U. S. 71, 77.  Fourth, this Court reads the Litigation Act in light of and consistent with the language and purpose of the underlying regulatory statutes, the Securities Exchange Act of 1934 and the Securities Act of 1933, which refer to persons engaged in securities transactions that lead to the taking or dissolving of ownership positions, and which make it illegal to deceive a person when he or she is doing so.  The basic purpose of the 1934 and 1933 regulatory statutes is to protect investor confidence in the securities markets.  Nothing in those statutes, or in the Litigation Act, suggests their object is to protect persons whose connection with the statutorily defined securities is more remote than buying or selling.  Fifth, a broader interpretation of the necessary statutory "connection" would interfere with state efforts to provide remedies for victims of ordinary state-law frauds, despite the fact that the Litigation Act purposefully seeks to avoid such results by maintaining States' legal authority over matters that are primarily of state concern, see, *e.g.,* §§78bb(f)(4).  Pp. 9–14.

(b) Respondents and the Government make two important, but unavailing, counterarguments.  First, they point to this Court's sugges-

Cite as:  571 U. S. ____ (2014)                                  3

Syllabus

tions that the phrase "in connection with" should be given a broad in-
terpretation.  But every case in which this Court interpreted the
phrase to cover a fraud involved a false statement (or the like) that
was "material" to another individual's decision to "purchase or s[ell]"
a statutorily defined "security" or "covered security," *e.g., Dabit, su-
pra,* at 75–77, and where the transaction was by or on behalf of
someone other than the fraudster.  Second, the Government warns
that a narrow interpretation would curtail the Securities and Ex-
change Commission's enforcement powers under §10(b) of the Securi-
ties Exchange Act, which uses the same "in connection with the pur-
chase or sale" phrase.  To the contrary, this Court's interpretation is
perfectly consistent with past SEC practice.  The authority of the
SEC and the Department of Justice extends to all "securities" under
§10(b), not just to those traded on national exchanges.  15 U. S. C.
§78c(a)(10).  The SEC has accordingly brought successful enforce-
ment actions against Stanford and his associates, based on the
Bank's fraudulent sales of certificates of deposit—products that are
"securities" even if not "covered securities."  Neither the Government
nor the dissent has pointed to an example of any prior SEC enforce-
ment action that the instant holding would have prevented the SEC
from bringing.  Pp. 14–17.

   (c) Respondents' complaints do not allege, for Litigation Act pur-
poses, misrepresentations or omissions of material fact "in connection
with" the "purchase or sale of a covered security."  At most, they al-
lege misrepresentations about the Bank's ownership of covered secu-
rities.  But the Bank is the fraudster, not the fraudster's victim; nor
is it some other person transacting in covered securities.  Thus, there
is not the necessary "connection" between the materiality of the mis-
statements and the statutorily required "purchase or sale of a cov-
ered security."  In addition, while the District Court found that one
plaintiff acquired Bank certificates with proceeds from the sale of
covered securities, the plaintiffs did not allege that the sale of these
covered securities constituted any part of the fraudulent scheme or
that Stanford or his associates were interested in how the plaintiffs
obtained the funds to purchase the certificates.  Thus, those sales
were only incidental to the fraud.  Pp. 17–19.

675 F. 3d 503, affirmed.

   BREYER, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and SCALIA, THOMAS, GINSBURG, SOTOMAYOR, and KAGAN, JJ.,
joined. THOMAS, J., filed a concurring opinion. KENNEDY, J., filed a dis-
senting opinion, in which ALITO, J., joined.

Cite as: 571 U. S. ____ (2014)                1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 12–79, 12–86, and 12–88

CHADBOURNE & PARKE LLP, PETITIONER
12–79            *v.*
SAMUEL TROICE ET AL.

WILLIS OF COLORADO INCORPORATED, ET AL.,
PETITIONERS
12–86            *v.*
SAMUEL TROICE ET AL.

PROSKAUER ROSE LLP, PETITIONER
12–88            *v.*
SAMUEL TROICE ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[February 26, 2014]

JUSTICE BREYER delivered the opinion of the Court.

The Securities Litigation Uniform Standards Act of 1998 (which we shall refer to as the "Litigation Act") forbids the bringing of large securities class actions based upon violations of state law. It says that plaintiffs may not maintain a class action "based upon the statutory or common law of any State" in which the plaintiffs allege "a misrepresentation or omission of a material fact *in connection with the purchase or sale of a covered security.*" 15 U. S. C. §78bb(f)(1) (emphasis added). The Act defines

Opinion of the Court

"class actions" as those involving more than 50 members. See §78bb(f)(5). It defines "covered security" narrowly to include only securities traded on a national exchange (or, here irrelevant, those issued by investment companies). §§78bb(f)(5)(E), 77r(b)(1)–(2).

The question before us is whether the Litigation Act encompasses a class action in which the plaintiffs allege (1) that they "purchase[d]" *uncovered* securities (certificates of deposit that are *not* traded on any national exchange), but (2) that the defendants falsely told the victims that the *uncovered* securities were backed by *covered* securities. We note that the plaintiffs do not allege that the defendants' misrepresentations led anyone to buy or to sell (or to maintain positions in) *covered* securities. Under these circumstances, we conclude the Act does not apply.

In light of the dissent's characterization of our holding, *post*, at 11–12 (opinion of KENNEDY, J.)—which we believe is incorrect—we specify at the outset that this holding does *not* limit the Federal Government's authority to prosecute "frauds like the one here." *Post*, at 11. The Federal Government *has* in fact brought successful prosecutions against the fraudsters at the heart of this litigation, see *infra*, at 5–6, and we fail to understand the dissent's repeated suggestions to the contrary, *post*, at 3, 4, 11, 12, 17. Rather, as we shall explain, we believe the basic consequence of our holding is that, without limiting the Federal Government's prosecution power in any significant way, it will permit victims of this (and similar) frauds to recover damages under state law. See *infra*, at 15–17. Under the dissent's approach, they would have no such ability.

I

A

The relevant statutory framework has four parts:

**(1) Section 10(b) of the underlying regulatory**

Opinion of the Court

statute, the **Securities Exchange Act of 1934.** 48 Stat. 891, as amended, 15 U. S. C. §78j (2012 ed.). This well-known statutory provision forbids the "use" or "employ[ment]" of "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." §78j(b).

Securities and Exchange Commission Rule 10b–5 similarly forbids the use of any "device, scheme, or artifice to defraud" (including the making of "any untrue statement of a material fact" or any similar "omi[ssion]") "in connection with the purchase or sale of any security." 17 CFR §240.10b–5 (2013).

For purposes of these provisions, the Securities Exchange Act defines "security" *broadly* to include not just things traded on national exchanges, but also "any note, stock, treasury stock, security future, security-based swap, bond, debenture . . . [or] certificate of deposit for a security." 15 U. S. C. §78c(a)(10). See also §§77b(a)(1), 80a–2(a)(36), 80b–2(a)(18) (providing virtually identical definitions of "security" for the Securities Act of 1933, the Investment Company Act of 1940, and the Investment Advisers Act of 1940).

**(2) A statute-based private right of action.** The Court has read §10(b) and Rule 10b–5 as providing injured persons with a private right of action to sue for damages suffered through those provisions' violation. See, *e.g., Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 730 (1975).

The scope of the private right of action is more limited than the scope of the statutes upon which it is based. See *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.,* 552 U. S. 148, 153, 155, 166 (2008) (private right does not cover suits against "secondary actors" who had no "role in preparing or disseminating" a stock issuer's fraudulent "financial statements"); *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 179

(1994) (private right does not extend to actions against "aiders and abettors" of securities fraud); *Blue Chip Stamps, supra,* at 737 (private right extends only to purchasers and sellers, not to holders, of securities).

**(3) The Private Securities Litigation Reform Act of 1995 (PSLRA).** 109 Stat. 737, 15 U. S. C. §§77z–1, 78u–4. This law imposes procedural and substantive limitations upon the scope of the private right of action available under §10(b) and Rule 10b–5. It requires plaintiffs to meet heightened pleading standards. It permits defendants to obtain automatic stays of discovery. It limits recoverable damages and attorney's fees. And it creates a new "safe harbor" for forward-looking statements. See §§78u–4, 78u–5.

**(4) The Securities Litigation Uniform Standards Act.** 112 Stat. 3227, 15 U. S. C. §78bb(f)(1)(A). As we said at the outset, this 1998 law forbids any

> "covered class action based upon the statutory or common law of any State . . . by any private party alleging—
> "(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
> "(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." §§78bb(f)(1)(A)–(B).

The law defines "covered security" narrowly. It is a security that "satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933." §78bb(f)(5)(E). And the relevant paragraphs of §18(b) of the 1933 Act define a "covered security" as "[a security] listed, or authorized for listing, on a national securities exchange," §77r(b)(1) (or, though not relevant here, as a security issued by an "investment

Opinion of the Court

company," §77r(b)(2)).   The Litigation Act also specifies
that a "covered security" must be listed or authorized for
listing on a national exchange "at the time during which it
is alleged that the misrepresentation, omission, or manip-
ulative or deceptive conduct occurred."  §78bb(f)(5)(E).

The Litigation Act sets forth exceptions.   It does not
apply to class actions with fewer than 51 "persons or
prospective class members."  §78bb(f)(5)(B).   It does not
apply to actions brought on behalf of a State itself.
§78bb(f)(3)(B)(i).   It does not apply to class actions based
on the law "of the State in which the issuer is incorpo-
rated."  §78bb(f)(3)(A)(i).   And it reserves the authority of
state securities commissions "to investigate and bring
enforcement actions."  §78bb(f)(4).

We are here primarily interested in the Litigation Act's
phrase "misrepresentation or omission of a material fact
in connection with the purchase or sale of a covered secu-
rity."  §78bb(f)(1)(A).  Unless this phrase applies to the class
actions before us, the plaintiffs may maintain their state-
law-based class actions, and they may do so either in
federal or state court.   Otherwise, their class actions are
precluded altogether.   See §78bb(f)(2) (providing for the
removal from state to federal court of class actions that
meet the specifications of paragraph 1, and for the dismis-
sal of such suits by the district court).

B

1

The plaintiffs in these actions (respondents here) say
that Allen Stanford and several of his companies ran a
multibillion dollar Ponzi scheme.   Essentially, Stanford
and his companies sold the plaintiffs certificates of deposit
in Stanford International Bank.   Those certificates "were
debt assets that promised a fixed rate of return." *Roland*
v. *Green*, 675 F. 3d 503, 522 (CA5 2012).   The plaintiffs
expected that Stanford International Bank would use the

Opinion of the Court

money it received to buy highly lucrative assets. But instead, Stanford and his associates used the money provided by new investors to repay old investors, to finance an elaborate lifestyle, and to finance speculative real estate ventures.

The Department of Justice brought related criminal charges against Allen Stanford. A jury convicted Stanford of mail fraud, wire fraud, conspiracy to commit money laundering, and obstruction of a Securities and Exchange Commission investigation. Stanford was sentenced to prison and required to forfeit $6 billion. The SEC, noting that the Bank certificates of deposit fell within the 1934 Securities Exchange Act's broad definition of "security," filed a §10(b) civil case against Allen Stanford, the Stanford International Bank, and related Stanford companies and associates. The SEC won the civil action, and the court imposed a civil penalty of $6 billion.

2

The plaintiffs in each of the four civil class actions are private investors who bought the Bank's certificates of deposit. Two groups of plaintiffs filed their actions in Louisiana state court against firms and individuals who helped sell the Bank's certificates by working as "investment advisers" affiliated with Stanford, or who provided Stanford-related companies with trust, insurance, accounting, or reporting services. (The defendants included a respondent here, SEI Investments Company.) The plaintiffs claimed that the defendants helped the Bank perpetrate the fraud, thereby violating Louisiana state law.

Two other groups of plaintiffs filed their actions in federal court for the Northern District of Texas. One group sued Willis of Colorado (and related Willis companies) and Bowen, Miclette & Britt, two insurance brokers; the other group sued Proskauer Rose and Chadbourne &

Opinion of the Court

Parke, two law firms.  Both groups claimed that the defendants helped the Bank (and Allen Stanford) perpetrate the fraud or conceal it from regulators, thereby violating Texas securities law.

The Louisiana state-court defendants removed their cases to federal court, and the Judicial Panel on Multi-District Litigation moved the Louisiana cases to the Northern District of Texas.  A single federal judge heard all four class actions.

The defendants in each of the cases moved to dismiss the complaints.  The District Court concluded that the Litigation Act required dismissal.  The court recognized that the certificates of deposit themselves were not "covered securities" under the Litigation Act, for they were not "'traded nationally [or] listed on a regulated national exchange.'"  App. to Pet. for Cert. in No. 12–86, p. 62.  But each complaint in one way or another alleged that the fraud included misrepresentations that the Bank maintained significant holdings in "'highly marketable securities issued by stable governments [and] strong multinational companies,'" and that the Bank's ownership of these "covered" securities made investments in the uncovered certificates more secure.  *Id.*, at 66.  The court concluded that this circumstance provided the requisite statutory "connection" between (1) the plaintiffs' state-law fraud claims, and (2) "transactions in covered securities."  *Id.*, at 64, 66–67.  Hence, the court dismissed the class actions under the Litigation Act.  *Id.*, at 75.  See also 675 F. 3d, at 511.

All four sets of plaintiffs appealed.  The Fifth Circuit reversed.  It agreed with the District Court that the complaints described misrepresentations about the Bank's investments in nationally traded securities.  Still, the "heart, crux, and gravamen of" the "allegedly fraudulent scheme was representing . . . that the [uncovered] CDs were a 'safe and secure' investment that was preferable to

8            CHADBOURNE & PARKE LLP *v.* TROICE

Opinion of the Court

other investments for many reasons." *Id.*, at 522. The court held that the falsehoods about the Bank's holdings in covered securities were too "'tangentially related'" to the "crux" of the fraud to trigger the Litigation Act. *Id.*, at 520, 522 (quoting *Madden* v. *Cowen & Co.*, 576 F. 3d 957, 965–966 (CA9 2009)). "That the CDs were marketed with some vague references to [the Bank's] portfolio containing instruments that might be [covered by the Litigation Act] seems tangential to the schemes," to the point where the complaints fall outside the scope of that Act. 675 F. 3d, at 522.

Defendants in the four class actions sought certiorari. We granted their petitions.

II

The question before us concerns the scope of the Litigation Act's phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." §78bb(f)(1)(A). How broad is that scope? Does it extend further than misrepresentations that are material to the purchase or sale of a covered security?

In our view, the scope of this language does not extend further. To put the matter more specifically: A fraudulent misrepresentation or omission is not made "in connection with" such a "purchase or sale of a covered security" unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a "covered security." We add that in *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U. S. 71 (2006), we held that the Litigation Act precluded a suit where the plaintiffs alleged a "fraudulent manipulation of stock prices" that was material to and "'concide[d]' with" third-party securities transactions, while also inducing the plaintiffs to "hold their stocks long beyond the point when, had the truth been known, they would have sold." *Id.*, at 75, 85, 89 (citing

Opinion of the Court

*United States* v. *O'Hagan*, 521 U. S. 642, 651 (1997)).  We
do not here modify *Dabit*.

## A

We reach this interpretation of the Litigation Act for
several reasons.  First, the Act focuses upon transactions
in covered securities, not upon transactions in uncovered
securities.  An interpretation that insists upon a material
connection with a transaction in a covered security is
consistent with the Act's basic focus.

Second, a natural reading of the Act's language supports
our interpretation.  The language requires the dismissal of
a state-law-based class action where a private party alleges
a "misrepresentation or omission of a material fact" (or
engages in other forms of deception, not relevant here) "in
connection with the purchase or sale of a covered secu-
rity."  §78bb(f)(1).  The phrase "material fact in connection
with the purchase or sale" suggests a connection that
matters.  And for present purposes, a connection matters
where the misrepresentation makes a significant differ-
ence to someone's decision to purchase or to sell a covered
security, not to purchase or to sell an uncovered security,
something about which the Act expresses no concern.  See
generally *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U. S.
___, ___ (2011) (slip op., at 9–12) (a misrepresentation or
omission is "material" if a reasonable investor would have
considered the information significant when contemplat-
ing a statutorily relevant investment decision).  Further,
the "someone" making that decision to purchase or sell
must be a party other than the fraudster.  If the only party
who decides to buy or sell a covered security as a result of
a lie is the liar, that is not a "connection" that matters.

Third, prior case law supports our interpretation.  As far
as we are aware, every securities case in which this Court
has found a fraud to be "in connection with" a purchase or
sale of a security has involved victims who took, who tried

Opinion of the Court

to take, who divested themselves of, who tried to divest themselves of, or who maintained *an ownership interest* in financial instruments that fall within the relevant statutory definition. See, *e.g.*, *Dabit, supra*, at 77 (Litigation Act: victims were "holders" of covered securities that the defendant's fraud caused to become overvalued); *SEC v. Zandford*, 535 U. S. 813, 822 (2002) (§10(b): victims were "duped into believing" that the defendant would "'invest' their assets in the stock market"); *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U. S. 588, 592 (2001) (§10(b): victim purchased an oral option to buy 10% of a company's stock); *O'Hagan, supra*, at 655–656 (§10(b): victims were "members of the investing public" harmed by the defendant's "gain[ing of an] advantageous market position" through insider trading); *Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co.*, 404 U. S. 6, 10 (1971) (§10(b): victim was "injured as an investor" when the fraud deprived it of "compensation for the sale of its valuable block of securities"). We have found no Court case involving a fraud "in connection with" the purchase or sale of a statutorily defined security in which the victims did not fit one of these descriptions. And the dissent apparently has not either.

Although the dissent characterizes our approach as "new," *post*, at 3, and tries to describe several of our prior cases, such as *Zanford* or *Dabit*, in a different way, *post*, at 14–15, it cannot escape the fact that every case it cites involved a victim who took, tried to take, or maintained an ownership position in the statutorily relevant securities through "purchases" or "sales" induced by the fraud. *E.g., Zandford, supra*, at 815, 820 (fraudster told customers he would "'conservatively invest' *their* money" in the stock market and made sales of "his *customer's* securities," but pocketed the proceeds (emphasis added)); *Dabit, supra*, at 76, 85, 89 (the "misrepresentations and manipulative tactics caused [the plaintiffs] to hold onto overvalued

Opinion of the Court

securities" while also inducing third parties to trade them); *In re Orlando Joseph Jett*, 82 S. E. C. Docket 1211, 1236–1237 (2004) (trader's scheme "greatly inflated the reporting trading profits" that his firm "used to determine . . . the amount of capital he was permitted to commit *on the firm's behalf*" (emphasis added)).

Fourth, we read the Litigation Act in light of and consistent with the underlying regulatory statutes, the Securities Exchange Act of 1934 and the Securities Act of 1933. The regulatory statutes refer to persons engaged in securities transactions that lead to the taking or dissolving of ownership positions. And they make it illegal to deceive a person when he or she is doing so. Section 5 of the 1933 Act, for example, makes it unlawful to "offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security." 15 U. S. C. §77e(c). Section 17 of the 1933 Act makes it unlawful "in the offer or sale of any securities . . . to employ any device, scheme, or artifice to defraud, or to obtain money or property by means of any untrue statement of a material fact." §§77q(a)(1)–(2). And §10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." §78j(b).

Not only language but also purpose suggests a statutory focus upon transactions involving the statutorily relevant securities. The basic purpose of the 1934 and 1933 regulatory statutes is "to insure honest securities markets and thereby promote investor confidence." See *O'Hagan, supra*, at 658. Nothing in the regulatory statutes suggests their object is to protect persons whose connection with the statutorily defined securities is more remote than words such as "buy," "sell," and the like, indicate. Nor does anything in the Litigation Act provide us with reasons for interpreting its similar language more broadly.

The dissent correctly points out that the federal securi-

Opinion of the Court

ties laws have another purpose, beyond protecting inves-
tors. Namely, they also seek to protect securities *issuers*,
as well as the investment advisers, accountants, and
brokers who help them sell financial products, from abu-
sive class-action lawsuits. *Post*, at 5. Both the PSLRA
and the Litigation Act were enacted in service of that goal.
By imposing heightened pleading standards, limiting
damages, and pre-empting state-law suits where the
claims pertained to covered securities, Congress sought to
reduce frivolous suits and mitigate legal costs for firms
and investment professionals that participate in the mar-
ket for nationally traded securities.

We fail to see, however, how our decision today under-
mines that objective. The dissent worries our approach
will "subject many persons and entities whose profession it
is to give advice, counsel, and assistance in investing in
the securities markets to complex and costly state-law
litigation." *Post*, at 4. To the contrary, the *only* issuers,
investment advisers, or accountants that today's decision
will continue to subject to state-law liability are those who
do not sell or participate in selling securities traded on
U. S. national exchanges. We concede that this means a
bank, chartered in Antigua and whose sole product is a
fixed-rate debt instrument not traded on a U. S. exchange,
will not be able to claim the benefit of preclusion under the
Litigation Act. But it is difficult to see why the federal
securities laws would be—or should be—concerned with
shielding such entities from lawsuits.

Fifth, to interpret the necessary statutory "connection"
more broadly than we do here would interfere with state
efforts to provide remedies for victims of ordinary state-
law frauds. A broader interpretation would allow the
Litigation Act to cover, and thereby to prohibit, a lawsuit
brought by creditors of a small business that falsely repre-
sented it was creditworthy, in part because it owns or
intends to own exchange-traded stock. It could prohibit a

Opinion of the Court

lawsuit brought by homeowners against a mortgage bro-
ker for lying about the interest rates on their mortgages—
if, say, the broker (not the homeowners) later sold the
mortgages to a bank which then securitized them in a pool
and sold off pieces as "covered securities." Brief for Six-
teen Law Professors as *Amici Curiae* 24.

The dissent all but admits this. Its proposed rule is that
whenever "the purchase or sale of the securities [including
by the fraudster] is what enables the fraud," the Litigation
Act pre-empts the suit. *Post*, at 12. In other words, *any
time* one person convinces another to loan him money, by
pretending he owns nationally traded securities or will
acquire them for himself in the future, the action consti-
tutes federal securities fraud, is subject to federal en-
forcement, and is *also* precluded by the Litigation Act if it
qualifies as a "covered class action" under §78bb(f)(5)(B)
(*e.g.*, involves more than 50 members). Leaving aside
whether this would work a significant expansion of the
scope of liability under the federal securities laws, it un-
questionably would limit the scope of protection under
state laws that seek to provide remedies to victims of
garden-variety fraud.

The text of the Litigation Act reflects congressional care
to avoid such results. Under numerous provisions, it
purposefully maintains state legal authority, especially
over matters that are primarily of state concern. See
§§78bb(f)(1)(A)–(B) (limiting preclusion to lawsuits in-
volving "covered," *i.e.*, nationally traded, securities);
§78bb(f)(4) (providing that the "securities commission . . .
of any State shall retain jurisdiction under the laws of
such State to investigate and bring enforcement actions");
§78bb(f)(3)(B) (preserving States' authority to bring suits
of the kind forbidden to private class-action plaintiffs).
See also 112 Stat. 3227 ("Congress finds that . . . it is
appropriate to enact national standards for securities class
action lawsuits involving nationally traded securities,

Opinion of the Court

while preserving the appropriate enforcement powers of State securities regulators"). A broad interpretation of the Litigation Act works at cross-purposes with this state-oriented concern. Cf. *Zandford*, 535 U. S., at 820 (warning against "constru[ing]" the phrase "in connection with" "so broadly as to convert any common-law fraud that happens to involve securities into a violation of §10(b)"); *Wharf (Holdings) Ltd.*, 532 U. S., at 596 (recognizing that "ordinary state breach-of-contract claims" are "actions that lie outside the [Securities Exchange] Act's basic objectives").

B

Respondents and the Government make two important counterarguments. Respondents point to statements we have made suggesting we should give the phrase "in connection with" a broad interpretation. In *Dabit*, for example, we said that the Court has consistently "espoused a broad interpretation" of "in connection with" in the context of §10(b) and Rule 10b–5, and we added that the Litigation Act language similarly warranted a "broad construction." 547 U. S., at 85–86. In *Bankers Life*, we said that, if a deceptive practice "touch[es]" a securities transaction, it meets §10(b)'s "in connection with" requirement, 404 U. S., at 12, and in *O'Hagan*, we said the fraud and the purchase or sale of a security must simply "coincide." 521 U. S., at 656. The idea, we explained in *Zandford*, is that the phrase "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" 535 U. S., at 819 (quoting *Affiliated Ute Citizens of Utah* v. *United States*, 406 U. S. 128, 151 (1972)).

Every one of these cases, however, concerned a false statement (or the like) that was "material" to another individual's decision to "purchase or s[ell]" a statutorily defined "security" or "covered security." *Dabit, supra*, at 75–77; *Zandford, supra*, at 822; *Wharf (Holdings) Ltd., supra*, at 590–592; *O'Hagan, supra*, at 655–657; *Bankers*

Opinion of the Court

*Life, supra,* at 10. And the relevant statements or omissions were material to a transaction in the relevant securities by or on behalf of someone other than the fraudster.

Second, the Government points out that §10(b) of the Securities Exchange Act also uses the phrase "in connection with the purchase or sale of any security." 15 U. S. C. §78j(b). And the Government warns that a narrow interpretation of "in connection with" here threatens a similarly narrow interpretation there, which could limit the SEC's enforcement capabilities. See Brief for United States as *Amicus Curiae* 28.

We do not understand, however, how our interpretation could significantly curtail the SEC's enforcement powers. As far as the Government has explained the matter, our interpretation seems perfectly consistent with past SEC practice. For one thing, we have cast no doubt on the SEC's ability to bring enforcement actions against Stanford and Stanford International Bank. The SEC has already done so successfully. As we have repeatedly pointed out, the term "security" under §10(b) covers a wide range of financial products beyond those traded on national exchanges, apparently including the Bank's certificates of deposit at issue in these cases. No one here denies that, for §10(b) purposes, the "material" misrepresentations by Stanford and his associates were made "in connection with" the "purchases" of those certificates.

We find it surprising that the dissent worries that our decision will "narro[w] and constric[t] essential protection for our national securities market," *post,* at 3, and put "frauds like the one here . . . not within the reach of federal regulation," *post,* at 11. That would be news to Allen Stanford, who was sentenced to 110 years in federal prison after a successful federal prosecution, and to Stanford International Bank, which was ordered to pay billions in federal fines, after the same. Frauds like the one here— including *this fraud itself*—will continue to be within the

Opinion of the Court

reach of federal regulation because the authority of the
SEC and Department of Justice extends to all "securities,"
not just to those traded on national exchanges. 15 U. S. C.
§78c(a)(10); accord, §77b(a)(1), §80a–2(a)(36), §80b–
2(a)(18). When the fraudster peddles an uncovered secu-
rity like the CDs here, the Federal Government will have
the full scope of its usual powers to act. The only differ-
ence between our approach and that of the dissent, is that
we *also* preserve the ability for investors to obtain relief
under state laws when the fraud bears so remote a connec-
tion to the national securities market that no person
actually believed he was taking an ownership position in
that market.

Thus, despite the Government's and the dissent's hand
wringing, neither has been able to point to an example of
any prior SEC enforcement action brought during the past
80 years that our holding today would have prevented the
SEC from bringing. At oral argument, the Government
referred to an administrative proceeding, *In re Richard
Line,* 62 S. E. C. Docket 2879 (1996), as its best example.
Our examination of the report of that case, however, indi-
cates that the defendant was a fraudster to whom the
fraud's victims had loaned money, expecting that he would
purchase securities on *their* behalf. *Id.,* at 2880 ("Line
represented to investors that he would invest their non-
admitted assets in various securities, including U. S.
Treasury notes, mutual fund shares, and collateralized
debt obligations"); *ibid.* ("[He] fabricated account state-
ments which falsely recited that securities had been
purchased on behalf of certain investors").

The Government's brief refers to two other proceedings
as demonstrating the SEC's broad §10(b) enforcement
powers. Each, however, involved defrauded investors who
had tried to take an ownership interest in the relevant
securities. *Jett,* 82 S. E. C. Docket, at 1251 (involving a
§10(b) action where a defrauded trading firm's "decision to

Opinion of the Court

purchase or 'invest' in strips or bonds . . . stemmed directly from the activity that constituted the fraud"); *In re D. S. Waddy & Co.*, 30 S. E. C. 367, 368 (1949) (involving a §10(b) action where a broker "appropriated to his own use money paid to him by customers for securities purchases"). We have examined SEC records without finding any further examples.

For these reasons, the dissent's warning that our decision will "inhibit" "litigants from using federal law to police frauds" and will "undermine the primacy of federal law in policing abuses in the securities markets" rings hollow. *Post*, at 4, 5. The dissent cannot point to one example of a federal securities action—public or private—that would have been permissible in the past but that our approach will disallow in the future. And the irony of the dissent's position is that federal law would have *precluded* private recovery in these very suits, because §10(b) does not create a private right of action for investors vis-à-vis "secondary actors" or "aiders and abettors" of securities fraud. *Stoneridge Investment Partners*, 552 U. S., at 152, 155; *Central Bank of Denver*, 511 U. S., at 180; accord, Brief for Petitioners in No. 12–86, p. 46 ("Any federal securities action against Petitioners would clearly run afoul of *Central Bank* and *Stoneridge*"); Brief for Respondents 48 (same); Brief for United States as *Amicus Curiae* 28 (same).

### III

Respondents' complaints specify that their claims rest upon their purchases of uncovered, not of covered, securities. Our search for allegations that might bring their allegations within the scope of the Litigation Act reveals the following:

(1) The first set of Texas plaintiffs alleged that they bought certificates of deposit from Stanford International Bank because they were told "the CDs issued by SIB

18          CHADBOURNE & PARKE LLP *v.* TROICE

Opinion of the Court

were safer even than U. S. bank-issued CDs" and "could be redeemed at any time," given that the Bank "only invested the money [*i.e.*, the Bank's money obtained from its certificate sale proceeds] in safe, secure, and liquid assets." App. 433. They claimed Stanford "touted the high quality of SIB's investment portfolio," and such falsehoods were material to their decision to purchase the uncovered certificates. *Id.*, at 444.

(2) The second set of Texas plaintiffs contended that they, too, purchased the Bank's certificates on the belief "that their money was being invested in safe, liquid investments." *Id.*, at 715. They alleged that the Bank's marketing materials stated it devoted "the greater part of its assets" to "first grade investment bonds (AAA, AA+, AA) and shares of stock (of great reputation, liquidity, and credibility)." *Id.*, at 744 (emphasis deleted).

(3) Both groups of Louisiana plaintiffs alleged that they were induced to purchase the certificates based on misrepresentations that the Bank's assets were "'invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.'" *Id.*, at 253, 345. And they claimed the "'liquidity/marketability of SIB's invested assets'" was "the most important factor to provide security to SIB clients." *Id.*, at 254.

These statements do not allege, for Litigation Act purposes, misrepresentations or omissions of material fact "in connection with" the "purchase or sale of a covered security." At most, the complaints allege misrepresentations about the *Bank's* ownership of covered securities—fraudulent assurances that the Bank owned, would own, or would use the victims' money to buy *for itself* shares of covered securities. But the Bank is an entity that made the misrepresentations. The Bank is the fraudster, not the fraudster's victim. Nor is the Bank some other person transacting (or refraining from transacting, see *Dabit*, 547

24

Opinion of the Court

U. S., at 75–77) in covered securities. And consequently, there is not the necessary "connection" between the materiality of the misstatements and the statutorily required "purchase or sale of a covered security." See *supra*, at 8.

A final point: The District Court found that one of the plaintiffs acquired Bank certificates "with the proceeds of selling" covered securities contained in his IRA portfolio. App. to Pet. for Cert. in No. 12–86, p. 70. The plaintiffs, however, did not allege that the sale of these covered securities (which were used to finance the purchase of the certificates) constituted any part of the fraudulent scheme. Nor did the complaints allege that Stanford or his associates were at all interested in how the plaintiffs obtained the funds they needed to purchase the certificates. Thus, we agree with the Court of Appeals that "[u]nlike *Bankers Life* and *Zandford*, where the entirety of the fraud depended upon the tortfeasor convincing the victims of those fraudulent schemes to sell their covered securities in order for the fraud to be accomplished, the allegations here are not so tied with the sale of covered securities." 675 F. 3d, at 523. In our view, like that of the Court of Appeals, these sales constituted no relevant part of the fraud but were rather incidental to it.

For these reasons the Court of Appeals' judgment is affirmed.

*It is so ordered.*

**APPENDIX TO
EXAMINER'S REPORT AND RECOMMENDATIONS NO. 8
AND REQUEST FOR STATUS CONFERENCE
(Prosecution of Third Party Class Actions and Related Litigation)**

# Exhibit B

Concurring Opinion
*Chadbourne & Parke, LLP v. Troice*, 571 U.S. _____,
134 S. Ct. 1058, 1072 (2014)

Cite as: 571 U. S. \_\_\_\_ (2014)     1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

Nos. 12–79, 12–86, and 12–88

CHADBOURNE & PARKE LLP, PETITIONER
12–79      *v.*
SAMUEL TROICE ET AL.

WILLIS OF COLORADO INCORPORATED, ET AL.,
PETITIONERS
12–86      *v.*
SAMUEL TROICE ET AL.

PROSKAUER ROSE LLP, PETITIONER
12–88      *v.*
SAMUEL TROICE ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[February 26, 2014]

JUSTICE THOMAS, concurring.

I join the opinion of the Court on the understanding that the "misrepresentation[s] . . . of . . . material fact" alleged in this case are not properly considered "in connection with" transactions in covered securities. 15 U. S. C. §78bb(f)(1)(A). We have said that the statutory phrase "in connection with" warrants a "broad interpretation," *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U. S. 71, 85 (2006), though not so broad as to reach any "common-law fraud that happens to involve securities," see *SEC* v. *Zandford*, 535 U. S. 813, 820 (2002). Considered in isolation, however, that phrase "is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.'"

27

CHADBOURNE & PARKE LLP *v.* TROICE

THOMAS, J., concurring

*Maracich* v. *Spears*, 570 U. S. ___, ___ (2013) (slip op., at 9) (some internal quotation marks omitted).  The phrase thus "provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions."  *Ibid.*  As I understand it, the opinion of the Court resolves this case by applying a limiting principle to the phrase "in connection with" that is "consistent with the statutory framework and design" of the Securities Litigation Uniform Standards Act of 1998, *id.,* at ___ (slip op., at 10), and also consistent with our precedents.

**APPENDIX TO**
**EXAMINER'S REPORT AND RECOMMENDATIONS NO. 8**
**AND REQUEST FOR STATUS CONFERENCE**
**(Prosecution of Third Party Class Actions and Related Litigation)**

# Exhibit C

Dissent
*Chadbourne & Parke, LLP v. Troice*, 571 U.S. \_\_\_\_,
134 S. Ct. 1058, 1072 (2014)

Cite as: 571 U. S. \_\_\_\_ (2014)          1

KENNEDY, J., dissenting

# SUPREME COURT OF THE UNITED STATES

Nos. 12–79, 12–86, and 12–88

CHADBOURNE & PARKE LLP, PETITIONER
12–79                            *v.*
SAMUEL TROICE ET AL.


WILLIS OF COLORADO INCORPORATED, ET AL.,
PETITIONERS
12–86                            *v.*
SAMUEL TROICE ET AL.


PROSKAUER ROSE LLP, PETITIONER
12–88                            *v.*
SAMUEL TROICE ET AL.


ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[February 26, 2014]

JUSTICE KENNEDY, with whom JUSTICE ALITO joins, dissenting.

A number of investors purchased certificates of deposit (CDs) in the Stanford International Bank (SIB). For purposes of this litigation all accept the premise that Allen Stanford and SIB induced the investors to purchase the CDs by fraudulent representations. In various state and federal courts the investors filed state-law suits against persons and entities, including attorneys, accountants, brokers, and investment advisers, alleging that they participated in or enabled the fraud. The defendants in the state-court suits removed the actions to federal court, where they were consolidated with the federal-court suits.

2               CHADBOURNE & PARKE LLP *v.* TROICE

KENNEDY, J., dissenting

The defendants contended that the state-law suits are precluded under the terms of the Securities Litigation Uniform Standards Act of 1998 (SLUSA or Act), 15 U.S.C. §78bb(f)(1).  As the investors prevailed in the Court of Appeals, they are the respondents here.  The persons and entities who were defendants in the state-law actions are the petitioners.  The investors contend the state-law suits are not precluded by SLUSA, and the petitioners contend the suits are precluded.

For purposes of determining SLUSA's reach, all can agree that the CD purchases would not have been, without more, transactions regulated by that Act; for the CDs were not themselves covered securities.  As a result, in determining whether the Act must be invoked, a further circumstance must be considered: The investors purchased the CDs based on the misrepresentations that the CDs were, or would be, backed by investments in, among other assets, covered securities.

What must be resolved, to determine whether the Act precludes the state-law suits at issue, is whether the misrepresentations regarding covered securities and the ensuing failure to invest in those securities were so related to the purchase of the CDs that the misrepresentations were "misrepresentation[s] or omission[s] of a material fact in connection with the purchase or sale of a covered security."  15 U.S.C. §78bb(f)(1)(A).

The opinion for the Court, it seems fair to say, adopts this beginning framework, and it is quite correct to do so.  The Court is further correct to view this litigation as involving a fraud of a type, scale, and perhaps sophistication that has not yet been addressed in its precedents with respect to the applicability of the federal securities laws.

It is the premise of this dissent that the more simple frauds addressed in this Court's precedents, where the Court did find fraud "in connection with the purchase or sale," are applicable here.  In those cases, as here, the

Cite as: 571 U. S. \_\_\_\_ (2014)  3

KENNEDY, J., dissenting

immediate cause of loss to the victim of the fraud was not simply a purchase or sale but rather a fraud that depended on the purchase or sale of securities or the promise to do so. It is submitted that this litigation should not come out differently simply because the fraud here was so widespread that many investors were misled by misrepresentations respecting investments, or promised investments, in regulated securities in the markets. And it is necessary to caution that, in holding otherwise, the Court adopts a new approach, an approach which departs from the rules established in the earlier, albeit simpler, cases. And, as a consequence, today's decision, to a serious degree, narrows and constricts essential protection for our national securities markets, protection vital for their strength and integrity. The result will be a lessened confidence in the market, a force for instability that should otherwise be countered by the proper interpretation of federal securities laws and regulations. Though the reasons supporting the Court's opinion are set forth with care and clarity, this respectful dissent submits that established principles do not support its holding.

I

It must be determined whether the misrepresentations to the investors—misrepresentations that led them to buy CDs in the belief they could rely on the expertise and sophistication of Stanford and SIB in the national securities markets—were "misrepresentation[s] or omission[s] of . . . material fact[s] in connection with the purchase or sale of a covered security." 15 U. S. C. §78bb(f)(1). This is the central provision of SLUSA for purposes of this litigation. The Court's precedents instruct that this language has broad application and must be construed flexibly in order to encompass new and ever more ingenious fraudulent schemes. *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit,* 547 U. S. 71, 85 (2006); *SEC* v. *Zandford,* 535 U. S.

KENNEDY, J., dissenting

813, 819 (2002). The Court has held that a material mis-representation is made "in connection with the purchase or sale" of a security when the "fraud coincided with the sales [or purchases] themselves." *Zandford, supra,* at 820.

This significant language must apply here in order to implement two of Congress' purposes in passing SLUSA. First, SLUSA seeks to preclude a broad range of state-law securities claims in order to protect those who advise, counsel, and otherwise assist investors from abusive and multiplicitous class actions designed to extract settlements from defendants vulnerable to litigation costs. This, in turn, protects the integrity of the markets. Second, even as the Act cuts back on the availability of state-law securities claims, a fair interpretation of its language ensures robust federal regulation of the national securities markets. That is because, in designing SLUSA, Congress "imported the key phrase" from §10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b–5, which provide a private cause of action, as well as SEC enforcement authority, for securities fraud. *Dabit,* 547 U. S., at 79, 85. As a result, that language must be "'presumed to have the same meaning'" in SLUSA as it does in those contexts. *Id.,* at 86.

The Court's narrow interpretation of the Act's language will inhibit the SEC and litigants from using federal law to police frauds and abuses that undermine confidence in the national securities markets. Throughout the country, then, it will subject many persons and entities whose profession it is to give advice, counsel, and assistance in investing in the securities markets to complex and costly state-law litigation based on allegations of aiding or par-ticipating in transactions that are in fact regulated by the federal securities laws.

A

Congress enacted SLUSA and its predecessor, the Pri-

KENNEDY, J., dissenting

vate Securities Litigation Reform Act of 1995, to reform
"perceived abuses of the class-action vehicle in litigation
involving nationally traded securities." *Dabit*, 547 U. S.,
at 81.   Congress found that these abuses were being used
"to injure 'the entire U. S. economy.'"   *Ibid.*   The Act and
its predecessor together addressed these problems by
limiting damages, imposing heightened pleading stand-
ards, and, as most relevant here, precluding state-law
claims involving nationally traded securities.   112 Stat.
3227; see S. Rep. No. 104–98, pp. 19–20 (1995); H. R. Rep.
No. 105–640, p. 10 (1998); S. Rep. No. 105–182, pp. 3–4
(1998).

   In light of the Act's objectives, the Act must be given
a "broad construction," because a "narrow reading of the
statute would undercut the effectiveness" of Congress'
reforms.   *Dabit, supra*, at 86.   Today's decision does not
heed that principle.   The Court's narrow reading of the
statute will permit proliferation of state-law class actions,
forcing defendants to defend against multiple suits in
various state fora.   This state-law litigation will drive up
legal costs for market participants and the secondary
actors, such as lawyers, accountants, brokers, and advis-
ers, who seek to rely on the stability that results from a
national securities market regulated by federal law.   See
*Central Bank of Denver, N. A.* v. *First Interstate Bank of
Denver, N. A.*, 511 U. S. 164, 189 (1994).   This is a serious
burden to put on attorneys, accountants, brokers, and
investment advisers nationwide; and that burden itself
will make the national securities markets more costly and
difficult to enter.   The purpose of the Act is to preclude
just these suits.   By permitting the very state-law claims
Congress intended to prohibit, the Court will undermine
the primacy of federal law in policing abuses in the securi-
ties markets.

   The Court casts its rule as allowing victims to recover
against secondary actors under state law when they would

KENNEDY, J., dissenting

not be able to recover under federal law due to *Central Bank. Ante,* at 12, 17. But in *Dabit* a unanimous Court rejected that conception of SLUSA. A federal-law claim was not available to the plaintiffs in *Dabit* because *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975), limited the Rule 10b–5 private right of action to purchasers and sellers, not holders. "[T]he Second Circuit held that SLUSA only pre-empts state-law class action claims brought by plaintiffs who have a private remedy under federal law." 547 U. S., at 74. The Court held the opposite, "concluding that SLUSA pre-empts state-law holder class-action claims." *Id.,* at 87. "It would be odd, to say the least," the Court reasoned, "if SLUSA exempted that particularly troublesome subset of class actions from its pre-emptive sweep." *Id.,* in *Dabit* also noted that SLUSA preclusion does not leave victims with "no" ability to "recover damages under state law." *Ante,* at 2. Rather, "[i]t simply denies plaintiffs the right to use the class-action device to vindicate certain claims." 547 U. S., at 87. The Court in *Dabit* precluded the suit at issue in order to effect the purpose of *Blue Chip.* By following the opposite course today, the Court revisits *Dabit*'s logic and undermines *Central Bank.*

B

Congress intended to make "federal law, not state law, . . . the principal vehicle for asserting class-action securities fraud claims." *Dabit, supra,* at 88. And a broad construction of the "in connection with" language found in both SLUSA and Rule 10b–5 ensures an efficient and effective federal regulatory regime, one equal to the task of deterring and punishing fraud and providing compensation for victims.

In undertaking regulation of the national markets during the Great Depression, Congress sought to eliminate the "abuses which were found to have contributed to

KENNEDY, J., dissenting

the stock market crash of 1929 and the depression of the 1930's." *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963). "'It requires but little appreciation . . . of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail' in every facet of the securities industry." *Id.*, at 186–187 (quoting *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 366 (1963)). In the Securities Exchange Act, Congress sought "'to achieve a high standard of business ethics in the securities industry'" by "'substitut[ing] a philosophy of full disclosure for the philosophy of *caveat emptor*.'" *Affiliated Ute Citizens of Utah* v. *United States*, 406 U. S. 128, 151 (1972). To that end, Congress enacted §10(b) "to insure honest securities markets and thereby promote investor confidence." *United States* v. *O'Hagan*, 521 U. S. 642, 658 (1997).

Investor confidence indicates fair dealing and integrity in the markets. See *Dabit, supra*, at 78; *O'Hagan, supra*, at 658; see also *Central Bank, supra*, at 188. It also is critical to achieving an efficient market. The corollary to the principle that insider trading and other frauds have an "inhibiting impact on market participation" is that investor confidence in strong federal regulation to prevent these abuses inspires participation in the market. See *O'Hagan, supra*, at 659. Widespread market participation in turn facilitates efficient allocation of capital to the Nation's companies. See also *Central Bank, supra*, at 188.

### C

Mindful of the ends of both SLUSA and Rule 10b–5, the Court's precedents interpret the key phrase in both laws to mean that a "misrepresentation or omission of a material fact" is made "in connection with the purchase or sale" of a security when the "fraud coincided with the sales [or purchases] themselves." *Zandford*, 535 U. S., at 820; see also *Dabit, supra*, at 85.

8          CHADBOURNE & PARKE LLP *v.* TROICE

KENNEDY, J., dissenting

This litigation is very similar to *Zandford* and satisfies the coincides test it sets forth, and for similar reasons. In *Zandford,* the SEC brought a civil action against a broker, who, over a period of time, gained control of an investment account, sold its securities, and then pocketed the proceeds. 535 U. S., at 815–816. The broker argued that "the sales themselves were perfectly lawful and that the subequent misappropriation of the proceeds, though fraudlent, is not properly viewed as having the requisite connection with the sales." *Id.,* at 820. The Court rejected that argument. Although the transactions were lawful and separate from the misappropriations, the two were "not independent events." *Ibid.* Rather, the fraud "coincided with the sales," in part because the sales "further[ed]" the fraud. *Ibid.*

The Court likened the broker's fraud to that in *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.,* 404 U. S. 6, 10 (1971), where the fraud victims were misled to believe that they "would receive the proceeds of the sale" of securities. *Zandford,* 535 U. S., at 821. Like the victims in *Bankers Life,* the victims in *Zandford* "were injured as investors through [the broker]'s deceptions" because "[t]hey were duped into believing that [the broker] would 'conservatively invest' their assets in the stock market and that any transactions made on their behalf would be for their benefit." *Id.,* at 822. Both suffered losses because they were victims of dishonest intermediaries or fiduciaries. See also *In re Richard J. Line,* 62 S.E.C. Docket 2879 (1996) (broker who induced parents to transfer funds to him to invest in securities so as to temporarily hide them during the college financial aid application process, but then failed to return the money, violated Rule 10b–5).

Here, just as in *Zandford,* the victims parted with their money based on a fraudster's promise to invest it on their behalf by purchases and sales in the securities markets.

KENNEDY, J., dissenting

The investors had—or were led to believe they could have—the advantages of Stanford's and SIB's expertise in investments in the national market.  So here, as in *Zandford,* the success of the fraud turned on the promise to trade in regulated securities.  According to the complaints, SIB represented that it would "'re-inves[t]'" the plaintiffs' money on their behalf in "a well-diversified portfolio of highly marketable securities issued by stable national governments, strong multinational companies, and major international banks" to ensure a "safe, liquid," and above-market return.  See App. 244, 249, 250, 253, 336, 342, 345, 444, 470, 480, 628.  The misrepresentation was about nationally traded securities and lent credence to SIB's promise that the CDs were a liquid investment that "could be redeemed with just a few days' notice."  See *id.,* at 253, 345, 445, 628.  The CDs, SIB explained, would be backed by nationally traded securities.  As a result, according to the complaints, the misrepresentation was "material."  *Id.,* at 244–245, 336–338, 480, 715.  The fraud could not have succeeded without the misrepresentation: The investors gave SIB money because they expected it to be invested in the national securities markets.  The connection between the promised purchases and the misrepresentation is more direct than in *Zandford,* because the misrepresentation was essential to the fraud.

Here, and again just as in *Zandford,* the fraud was not complete until the representation about securities transactions became untrue, just as Stanford intended all along. Instead of purchasing covered securities, SIB purchased some but fewer covered securities than it promised—only 10% of its portfolio, according to an affidavit attached to a complaint—and primarily speculated in Caribbean real estate.  Brief for Respondents 37; App. 594; but see Tr. of Oral Arg. 43–44 (suggesting SIB did not purchase securities).  It was not until SIB rendered the CDs illiquid by failing to make substantial investments in the nationally

10                CHADBOURNE & PARKE LLP *v.* TROICE

KENNEDY, J., dissenting

traded securities it promised that the fraud was consummated. At that point, SIB blocked the plaintiffs' access to the market. The fraud and SIB's failure to purchase all that it promised were not independent events. Rather, the false promises to invest in covered securities enabled and furthered the CD fraud. Without the false promise, there would have been no money to purchase the covered securities. On these facts, this Court's controlling precedents instruct that these misrepresentations were made "in conection with the purchase or sale" of regulated securities; and, as a result, state-law claims concerning them should be precluded.

*Dabit* provides further support for this conclusion. There, the Court held that an investment bank that deceived brokers into advising their clients to hold covered securities made misrepresentations "in connection with the purchase or sale of a covered security." "Under our precedents," the Court explained, "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else." 547 U. S., at 85. It did not matter that the plaintiffs did not purchase or sell securities, because they were participants in the national markets: "The requisite showing, in other words," is "'deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller.'" *Ibid.* (quoting *O'Hagan,* 521 U. S., at 658). Here, for like reasons, it does not matter that the fraud victims, as opposed to Stanford and SIB, were not the ones to fail to invest in the market. The very essence of the fraud was to induce purchase of the CDs on the (false) promise that investors should rely on SIB's special skills and expertise in making market investments in covered securities on their behalf. If promises related to covered securities are integral to the fraud in this direct way, federal regulation is necessary if confidence in the market is to be maintained.

KENNEDY, J., dissenting

That interest is at stake here. Because confidence in the ability to act as an investor without diversion of funds by intermediaries and insiders is critical, it does not matter if the victim of a fraud does not purchase or sell a security, *Dabit, supra*, at 85; or if the sale or purchase does not occur at the same time as the deception, *Bankers Life*, 404 U. S., at 12–13; or if no party to the actual transaction is deceived by the fraud, *O'Hagan, supra*, at 656; or if the misrepresentation has nothing to do with the value of a covered security, *Zandford*, 535 U. S., at 820. An investor's confidence in the market, and willingness to participate in it, may be severely undermined if frauds like the one here are not within the reach of federal regulation. Frauds like this one undermine investor confidence in attorneys, accountants, brokers, and investment advisers, the intermediaries on whom investors depend to gain access to the market. And when frauds are as widespread as this one, the market as a whole is weakened because investors, including sophisticated ones, are misled as to the amount of funds committed to the market and its consequent stability and resilience.

The rule that SLUSA applies when a misrepresentation about the market is coincident to the fraud is, then, essential to the framework of the Act and to federal securities regulation. Fraudulent practices "'constantly vary,'" and "'practices legitimate for some purposes may be turned to illegitimate and fraudulent means.'" *Bankers Life, supra*, at 12. That is why the key language "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford, supra*, at 819 (internal quotation marks omitted); see *Affiliated Ute*, 406 U. S., at 151. The language merits a "broad interpretation" because it is part of a residuary provision that must be able to accommodate evolving methods of fraud by intermediaries and insiders in ever more complicated securities markets. *Central Bank*, 511 U. S., at 174. Its interpretation

KENNEDY, J., dissenting

should not privilege fraudsters who devise ever more devious methods of committing fraud involving covered securities.

At the same time, the submitted interpretation is not so broad as to "convert every common-law fraud that happens to involve securities into a violation of §10(b)" or preclude all state tort claims that involve securities in a tangential way. *Zandford, supra,* at 820. So, for example, the statutory language does not extend to cover a thief who steals money from a store to buy securities or to a fraudster who defrauds a bank for a loan that he uses to buy securities. See *O'Hagan, supra,* at 656. The victims in those cases are not concerned about their ability to act as investors but rather about their duties as a store clerk or a loan officer. Those frauds involve securities transactions only as happenstance. As a result, the interpretation submitted in this dissent strikes the balance that Congress intended between forbidding frauds by intermediaries in the market without reaching frauds that touch the markets in only tangential ways.

The key question is whether the misrepresentation coincides with the purchase or sale of a covered security or the purchase or sale of the securities is what enables the fraud. Stanford's misrepresentation did so. Stanford promised to purchase covered securities for investors, using his special expertise, thus allowing investors to rely on his skill to participate in the national securities markets. The entire scheme rested on investors falling for the trick. When covered securities are so integral to the fraud, the false promise is incident to the purchase or sale of regulated securities because it coincides with it, and the misrepresentation respecting national securities enabled the fraud.

D

The Court interprets the phrase "misrepresentation or

KENNEDY, J., dissenting

omission of a material fact in connection with the purchase or sale of a covered security"—the key phrase in SLUSA and Rule 10b–5—in a different manner. The result, it is submitted, is inconsistent with the statutory scheme Congress enacted and casts doubt on the applicability of federal securities law to cases of serious securities fraud.

The Court construes the text of SLUSA and Rule 10b–5 to require a misrepresentation that "is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security.'" *Ante,* at 8. The Act simply does not say that the purchase or sale—or the promise to make a purchase or sale—must be by one other than the fraudster. Rather the Act states that there must be "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U. S. C. §78bb(f)(1)(A). See 17 CFR §240.10b–5 (2013) (requiring an "untrue statement of a material fact" "in connection with the purchase or sale of any security"). The Court narrows the statute Congress wrote in two ways. It excises the important "in connection with" language, resulting in a confined reading inconsistent with the Act's purpose, structure, and operation. And, by requiring the purchase or sale be made by someone "other than the fraudster," the Court inserts a limiting phrase that nowhere appears in the language of the provisions. In litigation like this, this new rule has it upside down. When the violation that adversely affects the securities market is done by the fraudster himself, that is all the more reason for applying federal law. This is not a case where Congress has limited its coverage to a certain subset of purchasers. Congress enacted such a limit two subsections later in SLUSA when detailing which actions are not precluded. See 15 U. S. C. §78bb(f)(3)(A)(ii)(I) ("the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of

KENNEDY, J., dissenting

equity securities of the issuer"). But it did not do so in the provision at issue.

The Court's reconstruction of the language of the provisions also casts doubt on the applicability of federal securities law to three established instances of federal securities fraud and one instance of preclusion under the Act as adjudged by the Court and the SEC in earlier cases.

First, the Court's interpretation necessarily suggests that *Zandford* is incorrect and that dishonest brokers need not fear Rule 10b–5 liability. The deceit in *Zandford* was that the broker would act as the victim's fiduciary when in fact he planned on selling (and did sell) the investor's securities for his own benefit. 535 U. S., at 820; see also *Line*, 62 S.E.C. Docket 2879 (broker's deceit was false promise to buy). The Court's rule that liability must rest on a finding that someone other than the fraudster purchased or sold securities is inconsistent with *Zandford*, where the recipient of the misrepresentation did not buy or sell. The Court's opinion disregards the hazards to the market when the fraudster is the one acting in the market and frustrates the investment objectives of his victims.

Second, the Court's interpretation is difficult to reconcile with liability for insider trading. In *O'Hagan*, the Court held that the "in connection with" element "is satisfied because the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities," "even though the person or entity defrauded is not the other party to the trade." 521 U. S., at 656. The Court's requirement that someone other than the fraudster purchase or sell a security is hard to square with *O'Hagan*.

Third, the Court's interpretation is difficult to square with the SEC's position in *In re Orlando Joseph Jett*, 82 S.E.C. Docket 1211 (2004). There, the SEC held liable a trader who fabricated complex trades to supplement the

KENNEDY, J., dissenting

returns of his real trades, so as to increase his standing
in his company.  The SEC likened Jett to "garden-variety
securities fraud cases in which a broker-dealer or invest-
ment adviser engages in unsuccessful securities trades for
a client and then hides the losses or inflates the profits by
sending out false account statements."  *Id.*, at 1253.  The
decision of the Court today would require that Jett's mis-
representation led to the purchase or sale of securities by
someone other than Jett.  But the SEC found Jett's own
purchases and sales to be sufficient to come within the
securities laws.

Finally, the Court's analysis is inconsistent with the
unanimous opinion in *Dabit*, which interpreted the same
statutory language at issue in this litigation.  *Dabit*
squarely rejected the view that "an alleged fraud is 'in
connection with' a purchase or sale of securities only when
the plaintiff himself was defrauded into purchasing or
selling particular securities."  547 U. S., at 85.  Instead,
it approved the SEC's interpretation that a broker who
"'sells customer securities with intent to misappropriate
the proceeds'" satisfies the "in connection with the pur-
chase or sale" requirement.  *Ibid.*, n. 10.  *Dabit* cannot be
reconciled with today's decision to require someone other
than the fraudster buy or sell a security.

It is correct that there is no case precisely standing for
the proposition that a victim does not have to take an
ownership position.  However, *O'Hagan* supports that
view.  *O'Hagan* clearly states that in insider trading cases
"the person or entity defrauded is not the other party to
the trade."  521 U. S., at 656.  And in *Zandford* a fraudster
told customers he would invest "their money" in securities
and then sold those securities.  535 U. S., at 815.  Here the
fraudster told plaintiffs that he would "re-invest" "their"
money in securities and then bought different securities.
App. 250, 470, 715.  The only difference is that there the
fraudster sold and here he bought.  Federal regulation

KENNEDY, J., dissenting

should not turn on whether a fraudster arrives before or after an investor makes his first purchase.

## II

The Court's interpretation also introduces confusion into securities law by not defining what it means for someone "other than the fraudster to buy or sell" a security, a rule that it derives from its view that the precedents all involve victims who had an ownership interest in securities. *Ante*, at 8–10. The precedents the Court cites involve what the parties have called direct ownership, where the victim buys or sells an entire equity. By using the term ownership interest instead of ownership, the Court also appears to accept the respondents' concession that indirect ownership, where the victim buys or sells shares in a defendant fund that itself owns equities, is sufficient in certain circumstances, such as when a victim has "some interest in the defendant's supposed portfolio." Brief for Respondents 16.

An ownership rule distinguishing between different types of indirect ownership is unworkable. Indirect ownership is a common type of investment. See M. Fink, The Rise of Mutual Funds 1 (2008) (U. S. mutual funds have over 88 million American shareholders and over $11 trillion in assets). Yet whether indirect ownership involves an interest in the underlying equities is a complex question of corporation, LLC, or partnership law. See *In re Bernard L. Madoff Inv. Securities LLC*, 708 F. 3d 422, 427 (CA2 2013). Congress likely did not intend preclusion of state-law suits to depend on the complexities of the Delaware Code.

The Court's ownership approach also casts doubt on the scope of Rule 10b–5. Under the Court's interpretation, §10(b) applies to fraudulent mutual or hedge funds not because those funds invest in securities but because investments in the funds are securities. But not all such

KENNEDY, J., dissenting

investments are securities. 2 L. Ribstein & R. Keatinge, Limited Liability Companies §14:2 (2010) (discussing test for a security from *SEC* v. *W. J. Howey Co.*, 328 U. S. 293 (1946)); 1 H. Bloomenthal & S. Wolff, Securities Law Handbook §§2:3 to 2:4 (2010). For those that are not, the Court seems to envision liability only when the investment confers an ownership interest in the fund's securities. And the general rule for investments in funds organized as LLPs and LLCs is that they do not convey such claims. 1 Ribstein & Keatinge, *supra*, §7:11; see *In re Herald*, 730 F. 3d 112 (CA2 2013). As a result, in important instances Rule 10b–5 may not extend to mutual and hedge funds under the Court's interpretation.

It is true that the SEC pursued the fraudster with success here. But that is because the CDs are securities. See Order Denying Motion to Dismiss in *SEC* v. *Stanford International Bank*, No. 3–09–CV–0298–N (ND Tex., Nov. 30, 2011), pp. 5–10. This aspect of Stanford's fraud is not a necessary feature of all frauds involving funds similar to SIB.

## III

The fraudster in this litigation misrepresented that he would purchase nationally traded securities. That misrepresentation was made "in connection with the purchase or sale" of the promised securities because it coincided with them. The fraud turned on the misrepresentation. The Court's contrary interpretation excises the phrase "in connection with" from the Act, a phrase that the Court in earlier cases held to require a broad and flexible meaning. At the same time, by holding that the purchase or sale of securities be made by someone other than the fraudster, the Court engrafts a limitation that does not appear in the text. The result is to constrict the application of federal securities regulation in instances where dishonest brokers, insider traders, and lying employees purchase or sell

KENNEDY, J., dissenting

securities, or promise to do so, as part of the fraud. Today's decision introduces confusion in the enforcement of securities laws.

For these reasons, it is submitted that the judgment of the Court of Appeals should be reversed.