UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § | |
| *Plaintiff* | § § | |
| v. | § § | Civil Action No. 3:12-CV-01447-N |
| BDO USA, LLP, BDO INTERNATIONAL LTD., BDO GLOBAL COORDINATION B.V., AND BRUSSELS WORLDWIDE SERVICES BVBA | § § § § § § | |
| *Defendants.* | § § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.      PREFACE ......................................................................................................... 1

II.     PARTIES .......................................................................................................... 1

III.    PERSONAL JURISDICTION ........................................................................ 5

IV.     SUBJECT MATTER JURISDICTION & VENUE ...................................... 7

V.      FACTUAL BACKGROUND .......................................................................... 8

        A.      The Stanford Financial Group Empire ................................................ 8

        B.      Stanford Financial Group's Operations in the United States ................. 9

        C.      The Anatomy of the Stanford Ponzi Scheme ...................................... 12

                a.      The Beginning: Guardian International Bank ........................... 13

                b.      Stanford Creates a Safe Haven in Antigua ............................... 15

                c.      The Stanford Task Force ......................................................... 17

                d.      Stanford Solidifies His Power with Bribes, Loans and Kickbacks ........... 20

                e.      Stanford Financial Group Was Under Constant Investigation ................ 23

                f.      Stanford Financial Group Expands Sales into the United States ............. 23

                g.      Stanford Financial Group Breeds Loyalty Through Lavish Incentives .... 25

                h.      Dissecting the Fraud ............................................................... 25

                i.      Stanford Financial Group's House of Cards Finally Collapses ............... 28

        D.      BDO's Knowing Participation in the Stanford Ponzi Scheme ............ 30

                a.      BDO's Significant Role In Weakening Antigua's Banking Laws as a Member of the Stanford Task Force ....................................... 31

                b.      BDO Visits SIBL and Examines the Bank's Compliance with Antigua's Newly Weakened Banking Laws ............................... 33

                c.      BDO Violates Its Independence Requirements Under GAAS ................ 33

                d.      BDO Actively Conceals Material Information ........................... 34

e.      BDO Fails to Confirm that Stanford Group Company Remitted Investor Funds to Purchase SIBL CDs ..................................................... 36

f.      BDO Fails to Properly Modify Its Audit Opinions.................................. 37

g.      BDO Fails to Properly Consider and Apply Consolidation Principles..... 38

h.      BDO Issues Unqualified Audit Opinions Despite its Stanford Clients' Substantial Dependence on SIBL CDs ...................................................... 38

i.      Other Facts Showing BDO's Support of the Stanford Ponzi Scheme ...... 39

E.      BDO Failed in its Role as the Public Watchdog.................................................. 40

VI.     STATUTE OF LIMITATIONS DEFENSES .................................................................. 42

A.      Discovery Rule / Inquiry Notice / Equitable Tolling........................................... 42

VII.    CAUSES OF ACTION ................................................................................................... 42

COUNT 1:    Negligence/Gross Negligence ....................................................... 42

COUNT 2:    Aiding, Abetting, or Participation in Breaches of Fiduciary Duties............................................................................................... 43

COUNT 3:    Aiding, Abetting, or Participation in a Fraudulent Scheme..... 44

COUNT 4:    Aiding, Abetting, or Participation in Fraudulent Transfers .... 44

COUNT 5:    Negligent Retention / Negligent Supervision............................. 46

VIII.   RIGHT OF CONTROL OVER BDO USA AND THE MEMBER FIRMS ................... 46

IX.     PRINCIPAL / AGENT RELATIONSHIP....................................................................... 49

X.      JOINT ENTERPRISE / SINGLE BUSINESS ENTERPRISE........................................ 50

XI.     ALTER EGO ................................................................................................................... 51

XII.    RESPONDEAT SUPERIOR ......................................................................................... 53

XIII.   ACTUAL DAMAGES.................................................................................................... 54

XIV.    PUNITIVE DAMAGES ................................................................................................. 54

XV.     CONDITIONS PRECEDENT ........................................................................................ 55

XVI.    JURY DEMAND ............................................................................................................ 55

XVII.  PRAYER ................................................................................................................. 55

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § | |
| *Plaintiff* | § § | |
| v. | § § | Civil Action No. 3:12-CV-01447-N |
| BDO USA, LLP, BDO INTERNATIONAL LTD., BDO GLOBAL COORDINATION B.V., AND BRUSSELS WORLDWIDE SERVICES BVBA | § § § § § § § | |
| *Defendants.* | § § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

The Official Stanford Investors Committee files this Original Complaint (the "Complaint") against Defendants BDO USA, LLP, BDO INTERNATIONAL LTD., BDO GLOBAL COORDINATION B.V., and BRUSSELS WORLDWIDE SERVICES BVBA (collectively, "Defendants"), and alleges as follows:

## I. PREFACE

1.     This action is filed to recover damages for the Stanford Receivership Estate from Defendants based on their participation in the massive Ponzi scheme orchestrated by Allen Stanford and others that injured the companies comprising Stanford Financial Group.

## II. PARTIES

2.     Plaintiff The Official Stanford Investors Committee (the "Committee") was formed by this Court on August 10, 2010.  *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the

"Committee Order").   As stated in the terms of the Committee Order, the Committee is cooperating with Ralph S. Janvey, in his capacity as the Receiver of the Stanford Receivership Estate, to identify and prosecute actions and proceedings for the benefit of the Stanford Receivership Estate.   The Receiver has assigned certain claims to the Committee, including the specific claims asserted in this Complaint.   The Committee asserts these claims as assignee from the Receiver, and as such has standing to assert all of the claims assert in this Complaint.   In addition, the Committee has independent standing to bring the claims asserted herein as an unincorporated association created by Order of this Court that serves as the representative of Stanford's CD investor creditors.

3.      Defendant BDO USA, LLP, formerly known as BDO Seidman, LLC ("BDO USA"), is a Delaware limited liability partnership with its principal place of business in Chicago, Illinois.   Under Federal Rules of Civil Procedure 4(e)(1) and 4(h)(1)(A), and Texas Rules of Civil Procedure 106(a)(2) and 108, BDO USA may be served with process by mailing a true copy of the citation with an attached copy of this Complaint, by registered or certified mail, return-receipt requested, to BDO USA's registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701.   BDO USA has appeared through counsel herein.

4.      Defendant BDO International Ltd. ("BDO International") is a worldwide network of public accounting firms, including but not limited to:   (i) BDO International Ltd., a United Kingdom company limited by guarantee with its principal place of business in London, United Kingdom; (ii) BDO Global Coordination B.V., an entity incorporated under Netherlandish law with its statutory seat in Eindhoven, Netherlands and an office in Brussels, Belgium; (iii) Brussels Worldwide Services BVBA, a limited liability company incorporated in Belgium with

its statutory seat in Brussels, Belgium; (iv) BDO USA, LLP, a Delaware limited liability partnership with its principal place of business in Chicago, Illinois; (v) BDO Ecuador, an accounting firm formed under Ecuadorian law with its principal place of business in Quito, Ecuador; (vi) BDO Castillo Miranda y Compañía, S.C. ("BDO Mexico"), an accounting firm formed under Mexican law with its principal place of business in Mexico City, Mexico; (vii) BDO Peru, an accounting firm formed under Peruvian law with its principal place of business in Lima, Peru; and (viii) BDO España ("BDO Spain"), a Spanish limited company formed under Spanish law with its principal place of business in Madrid, Spain.  (Collectively, these firms and any other member firms in BDO International's network of public accounting firms are referred to as BDO International's "Member Firms".)  BDO International has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas.  BDO International may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965).  BDO International has appeared through counsel herein.

5.      Defendant BDO Global Coordination B.V. ("BDO Global"), formerly known as BDO International B.V., is an entity incorporated under Netherlandish law with its statutory seat in Eindhoven, Netherlands and an office in Brussels, Belgium.  BDO Global is part of a worldwide network of public accounting firms, including but not limited to: (i) BDO International Ltd., a United Kingdom company limited by guarantee with its principal place of business in London, United Kingdom; (ii) Brussels Worldwide Services BVBA, a limited liability company incorporated in Belgium with its statutory seat in Brussels, Belgium; (iii) BDO USA, LLP, a Delaware limited liability partnership with its principal place of business in Chicago, Illinois; (iv) BDO Ecuador, an accounting firm formed under Ecuadorian law with its

principal place of business in Quito, Ecuador; (v) BDO Mexico, an accounting firm formed under Mexican law with its principal place of business in Mexico City, Mexico; (vi) BDO Peru, an accounting firm formed under Peruvian law with its principal place of business in Lima, Peru; and (vii) BDO Spain, a Spanish limited company formed under Spanish law with its principal place of business in Madrid, Spain.  (Collectively, these firms and any other member firms that are part of BDO Global's worldwide network of public accounting firms are referred to as BDO Global's "Member Firms".)  BDO Global has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas. BDO Global may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965).  BDO Global has appeared through counsel herein.

6.     Defendant Brussels Worldwide Services BVBA ("BDO Services") is a limited liability company incorporated in Belgium with its statutory seat in Brussels, Belgium.  BDO Services is part of a worldwide network of public accounting firms, including but not limited to: (i) BDO International Ltd., a United Kingdom company limited by guarantee with its principal place of business in London, United Kingdom; (ii) BDO Global Coordination B.V., an entity incorporated under Netherlandish law with its statutory seat in Eindhoven, Netherlands and an office in Brussels, Belgium; (iii) BDO USA, LLP, a Delaware limited liability partnership with its principal place of business in Chicago, Illinois; (iv) BDO Ecuador, an accounting firm formed under Ecuadorian law with its principal place of business in Quito, Ecuador; (v) BDO Mexico, an accounting firm formed under Mexican law with its principal place of business in Mexico City, Mexico; (vi) BDO Peru, an accounting firm formed under Peruvian law with its principal place of business in Lima, Peru; and (vii) BDO Spain, a Spanish limited company formed under

Spanish law with its principal place of business in Madrid, Spain.  (Collectively, these firms and any other member firms that are part of BDO Services' worldwide network of public accounting firms are referred to as BDO Services' "Member Firms".)   BDO Services has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas.  BDO Services may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965).  BDO Service has appeared through counsel herein.

7.     Collectively, BDO USA, BDO International, BDO Global, and BDO Services are referred to as "BDO" in this Complaint.

### III.   PERSONAL JURISDICTION

8.     This Court has personal jurisdiction over non-resident BDO USA under the Texas Long Arm Statute.  BDO USA has conducted continuous and systematic business in the State of Texas for many years and is therefore subject to general jurisdiction.  Furthermore, as described herein, BDO USA has engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial Group, including Stanford Group Company, headquartered in Houston, Texas, that give rise to Plaintiff's causes of action, and therefore BDO USA has done business and committed torts, in part, in the State of Texas.

9.     Beginning in 1995, BDO USA provided audit, tax, or other professional  services to the most important businesses of Stanford Financial Group, headquartered and controlled in Houston, Texas, including Stanford Group Company, Stanford Trust Company (Louisiana), Stanford Group Holdings, Stanford International Bank Ltd., Stanford Capital Management, LLC, and Stanford Coins & Bullion, Inc.  When providing such audit and other professional services to these Stanford Financial Group entities, BDO USA engaged in extensive contacts with Stanford Financial Group personnel based in Houston, Texas.  In conjunction with BDO USA's

provision of such audit and other professional services to Stanford Financial Group, BDO USA engaged in contacts with the State of Texas that assisted and perpetuated the Stanford Ponzi scheme described herein.  BDO USA also maintains, and has maintained, offices in Texas. Based on its general and specific contacts with the State of Texas, BDO USA has purposefully availed itself of the privilege of conducting activities within Texas and has established minimum contacts with the State of Texas under the Texas Long Arm Statute.

10.     Furthermore, BDO International, BDO Global, and BDO Services, either directly or through their network of affiliated Member Firms and agents, have engaged in specific jurisdiction contacts with the State of Texas.  Specifically, BDO International, BDO Global, and BDO Services directly and/or through their Member Firms and agents, have engaged in specific jurisdiction contacts with Stanford Financial Group headquartered in Houston, Texas, these contacts give rise to Plaintiff's causes of action, and therefore BDO International, BDO Global, and BDO Services have done business and committed torts, in part, in the State of Texas. Beginning in 1995, BDO International, BDO Global, and BDO Services directly and/or through their Member Firms and agents, provided audit, tax, consulting, and/or other services to Stanford Financial Group headquartered in Houston, Texas, and in that capacity, engaged in extensive contacts with Stanford Financial Group personnel based in Houston, Texas to provide such services.  In providing such services to Stanford Financial Group, BDO International, BDO Global, and BDO Services acting directly and/or through their Member Firms and agents, provided consulting or other professional services to Stanford International Bank Ltd., which was controlled by Stanford Financial Group in Houston, Texas, including certain services for the Stanford Task Force (defined and described later in this Complaint) and conducting an operational review of Stanford International Bank Ltd.  BDO International, BDO Global, and

BDO Services, acting directly and/or through their Member Firms and agents, also improperly issued unqualified audit opinions on the annual financial statements of various Stanford Financial Group companies, which were controlled by Stanford Financial Group in Houston, Texas, including the annual financial statements of Stanford Group Company, Stanford Trust Company (Louisiana), Stanford Group Holdings, Stanford Capital Management, LLC, and Stanford Coins & Bullion, Inc.  BDO International, BDO Global, and BDO Services, acting directly and/or through their Member Firms and agents, also provided audit, tax, consulting, and/or other services to Stanford Financial Group companies in Ecuador, Mexico, Peru, and Spain, and such companies were controlled by Stanford Financial Group in Houston, Texas. Based on their general and specific contacts with the State of Texas, BDO International, BDO Global, and BDO Services, acting directly and/or through their Member Firms and agents, have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

11.     Furthermore, this Court has personal jurisdiction over Defendants pursuant to FED.  R. CIV. P. 4(k)(1)(C) and 28 U.S.C. § 754 and 1692.

## IV.   SUBJECT MATTER JURISDICTION & VENUE

12.     This Court has jurisdiction over this action, and venue is proper, under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).  Further, as the Court that appointed the Receiver and the Committee, this Court has jurisdiction over any claim brought by the Receiver, or the Committee as assignee, to execute Receivership duties.  Further, within 10 days after the Court entered the Order and Amended Orders Appointing Receiver, the Receiver filed the original Securities and Exchange Commission Complaint and the Order Appointing Receiver in the United States District Court for the Southern District of Florida and the United States District Courts for the districts in Texas pursuant to 28 U.S.C. § 754, giving this Court in

rem and in personam jurisdiction in those districts and every other district where the Complaint and Order have been filed.

## V.   FACTUAL BACKGROUND

### A.    The Stanford Financial Group Empire

13.    From the mid 1980s through February 2009, R. Allen Stanford ("Stanford") — a former bankrupt gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds.  The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself.  The companies operated under the brand name "Stanford Financial" with their worldwide headquarters located in Houston, Texas.   The conglomeration of Stanford companies (collectively, "Stanford Financial Group") included but were not limited to: (i) the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company ("SGC");  (ii) the Houston-based administrative company that serviced all the different companies, Stanford Financial Group Company;  (iii) the Antiguan-based offshore bank Stanford International Bank Ltd. ("SIBL"); (iv) Stanford Trust Company (Louisiana) ("STC"); (v) Stanford Trust Company Ltd. (Antigua) ("STCL"); and (vi) the representative offices of Stanford Trust Company Ltd. (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), that operated in Miami, Houston, and San Antonio.  Stanford Financial Group was ultimately controlled and managed principally from Houston, Texas in the United States.

14.    Stanford Financial Group's offshore banking operation began as Guardian International Bank in the mid 1980s.  Over the years, Stanford Financial Group grew into a purported full-service financial services firm, offering worldwide clients private banking and U.S.-based broker/dealer and investment adviser services.  Stanford Financial Group gave its

clients all the appearances of a highly successful operation, with lavish offices in some of the world's premier cities. Stanford himself made the Forbes list of the richest people in the world with a personal fortune estimated at $2.2 billion.

15.     The entire Stanford Financial Group operation was fueled primarily by one product: Certificates of Deposit ("CDs") issued by SIBL, the Antiguan offshore bank wholly owned by Stanford himself. Clients who were introduced to Stanford Financial Group, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the main financial product peddled by the group was the SIBL CD. SIBL CDs were sold worldwide by a web of different Stanford Financial Group promoter companies, including SGC, STC and SFIS, whose function was to promote the sale of SIBL CDs. For example, to access additional investor capital in Latin America, Stanford Financial Group established representative offices in Colombia (Stanford Group Columbia a/k/a Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores, S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico (Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama (Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru (Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela (Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion). These foreign offices were ultimately controlled and administered by Stanford Financial Group employees in Houston, Texas. By February 2009, Stanford Financial Group's records reveal that SIBL had total CD account balances of approximately $7.2 billion.

**B.     Stanford Financial Group's Operations in the United States**

16.     For the first decade of its operations, 1985 to 1995, Stanford Financial Group and its offshore bank (whether Guardian or SIBL) targeted a Latin American clientele. But by the

late 1990s, Stanford Financial Group had established a foothold in the United States.  In 1995, Stanford Financial Group established SGC, and in February 1996, SGC was registered as a broker/dealer and investment adviser.  SGC established offices initially in Houston and Baton Rouge, Louisiana.  SGC began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying them enormous signing bonuses to leave their jobs at other firms and transfer their books of clients over to SGC.  Fueled by this influx of veteran bankers, brokers and financial advisers, SGC grew from 6 branch offices in the United States in 2004 to more than 25 offices across the United States (but principally concentrated in the Southern United States) in 2007.

17.     Since the 1980s, Allen Stanford recognized the huge potential for marketing his offshore CDs to Latin Americans via the "gateway" city of Miami.  In 1998, Stanford Financial Group established SFIS in order to sell the SIBL CDs to foreign investors out of Miami.  SFIS was organized under Florida state law in order to evade federal banking and securities regulations.  The Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford Financial Group, primarily from sales to CD investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela.  Stanford Financial Group also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities.

18.     Stanford Financial Group also increased sales of SIBL CDs by targeting the IRA accounts of its U.S. investors.  In 1998, Stanford Financial Group established STC in Baton Rouge, Louisiana to serve as the trustee/custodian for IRA accounts owned by investors referred from SGC.  After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in many cases, all of their IRA accounts into the SIBL CDs.

19.     For all of these promoter companies — whether SGC, SFIS, or STC — the primary product marketed and sold was the SIBL CD, as it sustained Stanford Financial Group's operations and paid the employees' exorbitant salaries and bonuses.  The promoter companies were all members of Stanford Financial Group, were ultimately owned by Stanford himself, were interconnected via intercompany marketing and referral fee agreements, and were controlled by Stanford Financial Group in Houston, Texas.

20.     Houston, Texas was Stanford Financial Group's nerve center and principal base of all operations, including SIBL, SGC, SFIS, and STC.  STC was wholly owned by Houston-based SGC and controlled by Stanford Financial Group personnel in Houston, and virtually every member of the STC Board of Directors at any time was an employee of SGC.  Stanford Financial Group directed STC's operations and provided all administrative functions from Houston.  STC's annual budget and financial forecasts were prepared by Stanford Financial Group personnel in Houston, and even reimbursement of expenses for STC employees was handled out of Houston.

21.     All the sales and marketing practices for the companies comprising Stanford Financial Group — including *SIBL* — as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial Group.  SIBL itself never had a marketing or sales arm in Antigua; rather it depended entirely on all the separate promoter or "feeder" companies like SGC, SFIS, and STC to sell its CDs.  The head of Stanford Financial Group's global sales operation for the marketing and sale of SIBL CDs was located in Houston, Texas.

22.     The sales practices, directives, techniques, strategies and reward programs for Stanford Financial Group, including SIBL, were developed and crafted in Houston and

disseminated to the various Stanford Financial Group branch offices around the world, including STC and SFIS.  The sales force training manuals, promotional literature, and materials for SIBL, including the Spanish-language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial Group sales offices around the world to be utilized by the local sales force in each country.

23.     In addition, mandatory sales training for the Stanford Financial Group sales force for SIBL CDs was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial Group personnel.  In those mandatory training sessions, sometimes twice a year, Stanford Financial Group's financial advisers ("FAs") were trained to sell the image of Stanford Financial Group.  The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into their heads again and again.

**C.     The Anatomy of the Stanford Ponzi Scheme**

24.     In reality, Stanford Financial Group was a massive, worldwide Ponzi scheme. The gist of the fraud was actually quite simple.  Stanford Financial Group sold SIBL CDs through a flashy marketing campaign that was designed to trick investors into believing they were purchasing safe, secure, insured, and highly liquid CDs, which were purportedly regulated in the United States because SGC was a U.S. licensed broker/dealer.  At the same time, Stanford Financial Group maintained a veil of secrecy over SIBL's purported investment portfolio and its use of CD investors' money.  Thus, Stanford Financial Group went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's purported operations and assets.

25.     SIBL was actually insolvent (i.e., its liabilities exceeded the fair value of its assets) from at least 1999 and yet it continued selling CDs to the bitter end.  Stanford Financial

Group induced investors to buy CDs by offering unusually consistent and above-market rates, publishing fraudulent financial statements prepared by a small accounting firm in Antigua, C.A.S Hewlett & Co., Ltd. ("Hewlett & Co."), furnishing other data that significantly overstated SIBL's purported earnings and assets, and misrepresenting the bank's business model, investment strategy, financial strength, safety and nature of its investments, and other facts important to investors.

26.     In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way Stanford Financial Group could keep the scheme going was by using proceeds from new CD sales to pay redemptions, interest, and operating expenses. SIBL's purported assets were fraudulently inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels. Each year or quarterly reporting period, Stanford Financial Group would simply determine what level of fictitious revenue SIBL "needed" to report to entice investors, satisfy regulators, and purport to cover its CD obligations and other expenses. Stanford Financial Group would then "plug" the necessary revenue amount by assigning equally fictitious revenues to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

### a.     The Beginning: Guardian International Bank

27.     Stanford opened his first offshore bank, Guardian International Bank Ltd. ("Guardian Bank"), in 1985 on the tiny Caribbean island of Montserrat (12,000 residents). To provide the veneer of legitimacy and aid sales, Stanford established representative offices for Guardian Bank in Miami and Houston, under the name of Guardian International Investment Services ("Guardian Services"). Guardian Bank and Guardian Services provided the starting point and roadmap for creating the Stanford Financial Group empire, as Stanford followed this

same strategy for the next 24 years: utilizing an offshore bank with U.S. sales and administrative offices.  Guardian Bank's main product was a bank certificate of deposit — with rates typically 2% to 3% above the average rates available in the U.S. market — and protected by all the confidentiality associated with offshore private banking. Stanford brought in his old college roommate James Davis to help run operations.

28.     By 1988 Stanford had been accused of violating banking laws in Texas for running unlicensed "feeder" sales offices in Houston for Guardian Bank.  In 1988 and again in 1989, the U.S. Office of the Comptroller of the Currency ("OCC") issued advisories concerning Stanford's similar violations of banking laws in Florida and California.

29.     By 1989, the banking system in Montserrat came under investigation by British and U.S. authorities.  Consequently, Guardian Bank itself came under scrutiny for possible drug money laundering, so Stanford looked to move his bank to a new location.  On November 28, 1990, the Financial Secretary of Montserrat notified Stanford that it was going to revoke Stanford's banking licenses because: (i) Guardian Bank's auditor, Hewlett & Co., was not an approved auditor;[1]  (ii) Guardian Bank was operating in a manner "detrimental to its depositors"; (iii) Guardian Bank failed to supply satisfactory details as to its liquidity; (iv) one of Guardian Bank's directors (Stanford) was formerly bankrupt; and (v) Guardian Bank had failed to submit annual financial statements.   Before the threatened revocation could be imposed, however, Stanford picked up and re-incorporated Guardian Bank in Antigua in December 1990, and transferred all the assets of his Montserrat-licensed bank to the new Antiguan-licensed Guardian Bank.  By May 1991, Stanford's banking license was officially revoked by the Montserrat

---

[1]  The Montserrat Government determined that Stanford's accountant, whom he used continuously as SIBL's **only** auditor from 1987 until Stanford's collapse in 2009, fell short of the standards of qualification for an approved auditor, and the government accused Stanford of only using Hewlett & Co. to "*influence the withholding of detailed information that would normally be expected in audited financial statements.*"

Government (although in 1994 Stanford later sued the Government of Montserrat to have that order rescinded).  In effect, Stanford simply picked up his banking operations and moved them to Antigua, and continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of his Antiguan bank from Guardian to Stanford International Bank Ltd. (SIBL) in 1994.

### b.    Stanford Creates a Safe Haven in Antigua

30.    Stanford could not have perpetuated this fraud without his significant influence over the Antiguan Government.  To gain this influence, Stanford used bribes to curry favor with Antiguan officials and build a safe haven for his Ponzi scheme.  Stanford had fled Montserrat precisely because he could not exert such pressure on the local government, and he was swept up in Montserrat's clean-up of the banking sector in the late 1980s.  When Stanford fled to Antigua in December 1990, Antigua had the reputation of being the most corrupt island in the Caribbean.

31.    Stanford immediately "bought" his influence in Antigua by purchasing the ailing and insolvent Bank of Antigua.  He extracted concessions from the Antiguan Government, including permits to establish a new bank by replacing Guardian Bank with SIBL and Stanford Trust Company Ltd. ("STCL"), as well as residency status in Antigua for Stanford and his top executives.

32.    In 1994, Stanford strengthened his Antiguan political ties by inserting himself and his companies into the Antiguan Government's efforts to build a new hospital.  This opportunity arose after Stanford helped the Prime Minister, Lester Bird, by flying him to Houston and paying for Bird's medical expenses after Bird thought he was having a heart attack.

33.    In November of that year, Bird allowed Stanford to select contractors for the hospital project, and Stanford's bank assumed the role of lead financier on the project.

Stanford's Bank of Antigua, using funds derived from SIBL CD sales, purportedly funded an interim loan to the Antiguan Government to finance 100% of the project's architectural and engineering costs.  Eventually, SIBL lent the Antiguan Government over $40 million for the new hospital.  The impoverished Antiguan Government, which in essence served as SIBL's ***only*** purported regulator, became heavily indebted to SIBL.

34.     Stanford's involvement in the hospital project prompted a 1996 U.S. Congressional investigation of corruption in Antigua, spearheaded by the FBI.  The Antiguan hospital scandal ignited a firestorm of negative press in Antigua about Lester Bird, Antiguan corruption, and Stanford's influence on the island.  In November 1995, two front-page articles in Antigua's "Outlet" newspaper questioned where Stanford got $40 million to finance the project, as the Bank of Antigua likely did not have that kind of money, and the bank did not even publish its financial statements as required by Antiguan banking law.  The articles also complained that Lester Bird's government had basically allowed Stanford to "run things" in Antigua, and had been giving away Antiguan land to Stanford, including the Antiguan airport and contiguous land.

35.     By 1995, Stanford was really flexing his muscle in Antigua.  The government even allowed Stanford to rewrite the banking laws that regulated SIBL.   In June 1995, Stanford began drafting offshore trust legislation for Antigua because Antigua had no such legislation in existence (despite the fact that Stanford had set up a "trust" company, STCL, in Antigua in 1991).  Stanford's right hand and General Counsel at the time, Yolanda Suarez ("Suarez"), described how Stanford needed trust legislation for Antigua because he wanted to "develop Antigua as a platform" for offshore trust operations.

36.     In 1996, Antigua was attacked in the international press for providing a haven to money launderers and drug smugglers.  Offshore banks were being established left and right.

Stanford feared this undesirable press coverage would eventually disrupt or endanger SIBL. He decided that he had to "clean up" Antigua's reputation. In September 1996, Stanford's agents directed a letter to Antigua's Prime Minister, Lester Bird, and offered suggestions on how Antigua could clean up its banking sector. The letter noted how Antigua had recently been the subject of some terrible reports in the press, including an article in the Washington Post, which described how Antigua and its offshore banking sector had become a haven for fraudsters and con artists. The letter then suggested 15 steps for the government to address in the banking and trust areas to establish some credibility for Antigua's financial sector.

c.      <strong>The Stanford Task Force</strong>

37.     In June 1997, at Stanford's instigation, the Antiguan Government formed and chartered the "Antiguan Offshore Financial Sector Planning Committee." The Committee's purpose was to offer recommendations for reforming Antigua's offshore banking sector. Not surprisingly, Stanford was appointed to *chair* the Committee. The Committee formed a Task Force (the "Stanford Task Force") to (i) review all offshore banks licensed in Antigua to ensure they were legitimate, and (ii) evaluate Antigua's banking regulatory regime and make recommendations to address any weaknesses.

38.     Stanford appointed *every* member of the Task Force, and every member was on Stanford Financial Group's payroll. The Task Force's members included three of Stanford Financial Group's outside lawyers; Kroll executives Tom Cash and Ivan Diaz; and several partners or associates from Stanford Financial Group's auditor in United States, BDO Seidman, namely Michael Ancona, Jeffrey Balmer, Keith Ellenburg, and Barry Hersh. No Antiguan citizen served on the Stanford Task Force.

39.     On September 15, 1997, the Task Force outlined some of its recommendations "for further development and eventual implementation" by the Antiguan Government.  In the section entitled "International Cooperation," the Task Force wrote that, while it was important for the Antiguan Government to cooperate with the judicial and regulatory authorities of other countries, at the same time, "*it is essential that Antigua and Barbuda not permit the wealth of its people and businesses to become the targets of overly aggressive enforcement actions*."  **One way to avoid such "overly aggressive enforcement actions," according to the Task Force, was to revise the list of "prescribed offenses" in Antiguan law such that the Antiguan Government would only be required to cooperate with foreign governments with respect to the** *"most serious of crimes, as intended, and not to lesser crimes which could conceivably be included under such vague terms as 'fraud' or 'false accounting'."*

40.     The Task Force worked closely with Wrenford Ferrance, an Antiguan Government official that Prime Minister Bird nominated as the Government's representative and liaison to the Task Force.  Although he was appointed by Prime Minister Bird to serve as Antigua's Director of International Business Corporations, Ferrance looked to Stanford Financial Group's agents on the Task Force for guidance.

41.     The Task Force's reforms in Antigua created a new Antiguan regulatory body, the International Financial Sector Authority ("IFSA"), which was charged with supervising and regulating the offshore banking sector.  Incredibly, Stanford was appointed to serve as the ***Chair of the IFSA***.  Furthermore, one of Stanford Financial Group's U.S. lawyers served along with its Antiguan lawyer, Errol Cort, who also happened to be the Attorney General of Antigua.  As a former member of the British High Commission in Barbados, Rodney Gallagher, put it: "***Stanford effectively became the man who controlled the regulator.***"

42.     After the IFSA was formed, according to news reports, Stanford's first order of business was to seize all the banking records of SIBL's offshore bank competitors in Antigua. Althea Crick, an Antiguan woman who had been appointed as the executive director of the IFSA, refused to turn the records over to Stanford.  So on February 8, 1999, Stanford sent his agents to the IFSA offices in the middle of the night, where they took the locked door off its hinges, stormed inside, seized file cabinets containing the confidential bank records, and then carted them off to Stanford Financial Group's offices to be copied.[2]

43.     The U.S. Government responded to Stanford's banking reforms and other shenanigans.  In April 1999, the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") issued an Advisory (the "Advisory") to warn banks and other financial institutions that banking transactions involving Antigua should be given enhanced scrutiny because the Antiguan government had *significantly weakened* its banking laws and regulatory agencies.  The nearly unprecedented Advisory also warned that the Antiguan Government had vested supervisory authority to a new regulator, the IFSA, which was rife with conflicts of interest because its "*board of directors includes representatives of the very institutions the Authority is supposed to regulate*."  According to the Advisory, this "*rais[ed] serious concerns that those representatives are in fact in control of the IFSA, so that the IFSA is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards*."  The Advisory continued,

> The amendment of the Money Laundering (Prevention) Act, combined with changes in [Antigua's] treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in [Antigua].  These changes threaten to create a

---

[2]  Michael Bilton, "*The Texan Who Fell to Earth*", The Sunday Times, January 9, 2011.

> *'haven' whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of [Antigua] aware.  The actions taken by the government of [Antigua] that weaken that nation's anti-money laundering laws and oversight of its financial institutions necessarily raise questions about the purposes of transactions routed into or out of [Antigua] or involving entities organized or domiciled . . . in [Antigua].*

44.     From 2005 through 2009, Stanford Financial Group and its outside counsel relied on these purported bank secrecy provisions to thwart several subpoenas and requests for documents from the U.S. Securities and Exchange Commission ("SEC") and other regulators who were investigating Stanford Financial Group's CD program.  Stanford Financial Group's constant refrain was that SIBL was prohibited by Antiguan secrecy laws from turning over any financial records to the SEC and other regulators.

### d.     Stanford Solidifies His Power with Bribes, Loans and Kickbacks

45.     Now firmly established in Antigua, Stanford Financial Group continued to strengthen its political ties with the Antiguan Government and corrupt officials.  In return for political cover, Stanford Financial Group eventually became a major source of funding for the entire island, eventually loaning tens of millions of dollars to the Antiguan Government. Stanford Financial Group even bought the Antiguan newspaper, the Antiguan Sun, to influence the media.  By 2004, the Antiguan Government owed over $87 million to Stanford Financial Group — nearly **half** the island's annual tax revenues — and certain of its loans were secured by the Government's tax revenues and medical fund.

46.     Stanford continued to leverage this influence through bribes, loans and kickbacks.  Various companies within Stanford Financial Group loaned tens of thousands of dollars to various Antiguan Government officials.  For example, Stanford Financial Group

companies loaned $30,000 to the Antiguan Minister of Finance, Molwyn Joseph, in February 1992, evidenced by a Promissory Note.  The Minister of Finance, *who during this time period was ultimately charged with overseeing SIBL*, never paid a dime on that loan.

47.     Stanford disguised these purported loans and other bribes as political contributions.  For example, in a May 6, 1994 memo from Stanford to his personal assistant, Jean Gilstrap, Stanford instructed Gilstrap to mark Molwyn Joseph's Promissory Note as "paid" and record it on company books as a political contribution.  He further noted that, prior to the recent Antiguan elections, Stanford had informed Joseph that he would contribute to Joseph's political party, the ALP, by "liquidating" Joseph's personal note.  Stanford also instructed Gilstrap to make sure she noted the "contribution" was made "after" the elections.

48.     Also in January 1996, Suarez prepared several spreadsheets that detailed money Stanford had loaned to senior Antiguan Government officials, either through direct loans or through credit cards, as well as loans made to the Antiguan Government.   This document revealed that **11 senior Antiguan Government officials**, including Lester Bird and Molwyn Joseph (who had received a new $100,000 loan from Stanford), owed Stanford a combined $140,000.

49.     Stanford's efforts to corrupt Antiguan officials were simply brazen.  A November 2003 newspaper article reported that Stanford had been accused of bribing two Antiguan Government officials — his old friend Molwyn Joseph and Gaston Browne — by giving them $100,000 each in connection with a land swap that Stanford was trying to orchestrate.  The article reported that members of the Antiguan opposition party had brought motions to suspend both ministers.  The article further reported that Stanford's response to these accusations was to

hold a press conference in which he "surprised" the audience by cavalierly declaring that he was going to donate an additional $200,000 to each of the two Antiguan officials.

50.     Antigua's corruption and lax banking regulations is likewise borne out by the Plea Agreement entered by Stanford Financial Group CFO Jim Davis (the "Davis Plea"), as well as by the June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and former head of Antigua's financial regulator, the Financial Services Regulatory Commission (the "FSRC"), which replaced the previous IFSA.  The Davis Plea and Indictment allege that for years, King — while acting as the CEO of the Antiguan FSRC — accepted bribes from Stanford and/or his associates in return for his assurance that the FSRC "looked the other way" and would not properly perform its regulatory functions or supervise SIBL.  King even entered into a bizarre "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford.  As part of this blood-brother relationship and bribery, King became Stanford's regulatory spy and "inside man" who relayed information to Stanford concerning the SEC's investigations of Stanford Financial Group and SIBL from 2005 all the way until 2009.  This was all just part of the broader conspiracy to keep the Ponzi scheme alive by evading and obstructing regulatory oversight of SIBL's activities, at every turn, and in every country.

51.     The Indictment and Plea Agreement also describe how SIBL's Antiguan auditor, Hewlett & Co., accepted "special" compensation from Stanford's secret "SocGen" "slush fund" account to fraudulently report SIBL's financial condition for use in SIBL's annual reports for some 20 years.   Hewlett & Co. forwarded those fraudulent "audits" to Stanford Financial Group in Houston, Texas every year for 20 years with full knowledge that the fraudulent audits would be utilized in Stanford's marketing materials to defraud depositors.

### e.    Stanford Financial Group Was Under Constant Investigation

52.    Stanford Financial Group was under constant investigation by numerous government agencies, including the OCC, SEC, FBI, and U.S Customs.  For example, in addition to the SEC investigation of Stanford Financial Group that began in 2005, the FBI and U.S. Customs had been investigating Stanford's possible involvement in laundering drug money as far back as 1991.  At one point, this investigation resulted in a U.S. Customs search of Stanford's private jet aircraft when he returned from the Caribbean.  After this search, FBI documents indicate that "*the Stanfords proceeded to fire a number of employees whom they suspected might be providing information to the authorities.*"

53.    U.S. Customs documents from this same period described Guardian Bank as having "*constant cash flow*" from foreign depositors but "*no regulation of [the bank's] activities*."  Other documents note that U.S. Customs in San Antonio had taken an interest in the "*possible smuggling activities of principals in the Stanford organization*."  FBI documents also reveal that Stanford had been under constant investigation for possible money laundering going back to 1989, and the FBI had even sent an agent to London as part of this investigation in September 1992.  Stanford was well known to U.S. authorities and "stayed very prominently on the radar for years," says one former FBI agent who investigated Stanford.  "There was a series of investigations.  Obviously none of them ever ended in indictments.  But we're talking various FBI field divisions, with multiple agents, then multiple agencies."

### f.    Stanford Financial Group Expands Sales into the United States

54.    In 1996, Stanford Financial Group finally crossed the Rubicon and entered the United States securities market.  First, it registered the newly formed SGC as an SEC-licensed securities broker/dealer and investment adviser.  SGC's sole mission was to sell SIBL CDs to

American investors.  At approximately this same time, Stanford Financial Group also expanded domestic sales of SIBL CDs to Latin American investors by establishing a representative office for Stanford Trust Company Ltd. (STCL), its Antiguan offshore trust company.

55.     In September 1998, Stanford Financial Group established a trust representative office in Miami, naming it Stanford Fiduciary Investor Services ("SFIS").  Stanford Financial Group expanded this SFIS model by opening additional SFIS "trust representative offices" in Houston and San Antonio in 2001 and 2005.  SFIS's sole mission was to sell SIBL CDs to Latin American investors, including exclusively Mexican investors through the San Antonio office.  The SFIS model proved very successful: Stanford Financial Group sold more than $1 billion in SIBL CDs through the Miami office alone.

56.     In 1998, Stanford Financial Group also established STC in Baton Rouge, Louisiana.  STC provided trustee and custodial services that allowed SGC to sell SIBL CDs to its clients' IRA accounts.  This new IRA component of the Stanford Ponzi scheme eventually funneled hundreds of millions of dollars into Stanford Financial Group.

57.     In November 1998, SIBL filed a Regulation D ("Reg. D") exemption with the SEC.  The exemption allowed SGC to sell SIBL CDs to "accredited investors" in the United States without registering the CDs as securities.  This initial exemption, which permitted a $50 million offering, planted the seed for Stanford Financial Group's exponential future growth.

58.     In 2001, SIBL filed an amended Reg. D exemption to increase the offering to $150 million.  By 2003, Stanford Financial Group had printed and distributed some 30,000 offering brochures to its FAs.  In response to increasing sales to U.S. investors, SIBL filed two additional amendments in 2004 that increased the offering to $200 million and then *$1 billion*.  These amendments set the stage for an intensive television advertising campaign, which Stanford

Financial Group launched in 2005, to promote further sales to accredited investors in the United States.

59.    By March 2006, Stanford Financial Group had distributed 4,424 SIBL CD "Accredited Investor" packets to investors under the Reg. D offering.  Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the offering to *$2 billion*.

**g.    Stanford Financial Group Breeds Loyalty Through Lavish Incentives**

60.     From 2004 to 2008, Stanford Financial Group grew into a high-powered sales and marketing machine.  The different Stanford Financial Group sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".  To market and sell SIBL CDs, Stanford Financial Group established a commission structure that provided huge incentives for its FAs, including those at SGC, to "push" the SIBL CDs on investors.  SIBL paid disproportionately large referral fees to SGC for the sale of its CDs: SGC received a 3% referral fee for each CD sale, with 1% going to the SGC broker who made the sale.  The FAs were eligible to receive an additional 1% trailing commission throughout the term of the CD.  Stanford also held "sales contests" and gave lavish gifts to FAs who sold the most CDs.   Stanford Financial Group used these inflated commissions to recruit established financial advisers, and to reward advisers who aggressively sold SIBL CDs to investors.  Of course, these incentives are extremely rare for bank CDs because they are economically unsustainable.

**h.    Dissecting the Fraud**

61.    The ultimate reality of Stanford Financial Group is that it was a Ponzi scheme based out of Houston, Texas.  In essence, Allen Stanford and his co-conspirators used the promise of SIBL CDs to lure investor money into Stanford Financial Group and then stole

billions of dollars in assets from Stanford Financial Group companies for their own personal benefit.  Substantial sums of these stolen funds were used to: (i) support the lavish lifestyles of Allen Stanford and his Ponzi insiders; (ii) issue bogus, unsecured personal "loans" to Allen Stanford; (iii) capitalize other entities wholly owned by Allen Stanford; and (iv) fund investments in speculative, illiquid, and high-risk assets, including private equity holdings and massive investments in Antiguan real estate.

62.     In addition to stealing billions of dollars from Stanford Financial Group companies, Allen Stanford and his co-conspirators violated the Investment Company Act by failing to segregate the investor funds that SIBL received for the purchase of CDs.  Instead, investor funds were commingled and then spread across all kinds of purported investments, which means Stanford Financial Group was actually operating as an unregistered investment "fund" that sold its internal securities product — the SIBL CDs — to investors.  Stanford Financial Group was never registered nor legally authorized to operate as an investment company in the United States.  Furthermore, under Section 47(b) of the Investment Company Act,

> [a] contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.  15 U.S.C. § 80a-46.

63.     These facts were never disclosed to CD investors.  Instead, investors were consistently and uniformly told — both verbally and via promotional materials — that Stanford Financial Group was compliant, authorized, and regulated by the SEC and Financial Industry

Regulatory Authority ("FINRA"), and backed by insurance coverage from the Securities Investor Protection Corporation ("SIPC") and Lloyd's of London.  CD investors were never told that the acts of Stanford Financial Group and its unregistered investment company were void as a matter of law under Section 47 of the Investment Company Act.

64.     As part of this fraud, Stanford Financial Group also uniformly touted the high liquidity of SIBL's purported investment portfolio.  For example, in its marketing materials distributed to CD investors from at least 1995 through 2009, Stanford Financial Group emphasized the importance of the SIBL CD's liquidity.  Under the heading "Depositor Security," Stanford Financial Group's materials state that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors."  None of that was true.  Likewise, Stanford Financial Group trained its FAs to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that the "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide security to SIBL clients . . . ."  To ensure investors would buy SIBL CDs, Stanford Financial Group, through its FAs, assured investors that SIBL's investments were liquid and diversified, and therefore the CDs themselves were highly liquid and could be redeemed with just a few days notice.

65.     In reality, however, billions of dollars in assets had been stolen by Allen Stanford and his co-conspirators.  Contrary to Stanford Financial Group's verbal and written statements to investors from 1995 through 2009, Allen Stanford and his Ponzi insiders misappropriated billions of dollars from Stanford Financial Group companies to: (i) support the lavish lifestyles of Allen Stanford and his Ponzi insiders; (ii) issue bogus, unsecured personal "loans" to Allen Stanford; (iii) capitalize other entities wholly owned by Allen Stanford; and (iv) invest in speculative, illiquid, and high-risk ventures, including private equity and real estate development

projects in Antigua and elsewhere in the Caribbean.  For example, by February 2009, Allen Stanford and his cronies had stolen at least $1.8 billion through the bogus loans *alone*.  Stanford Financial Group also failed to inform investors that hundreds of millions of dollars of depositor funds were used to create and perpetuate the charade of Stanford Financial Group's image, with lavish offices, excessive bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial Group image of wealth, power, and prestige.

66.     As alleged in the Davis Plea and the criminal Indictment of Allen Stanford and his associates, Stanford and his CFO Jim Davis fabricated the nature, size, and performance of SIBL's purported investment portfolio.  Gilberto Lopez and Mark Kuhrt, accountants for the Stanford Financial Group companies, fabricated the financial statements using pre-determined returns on investments that were typically provided by Stanford or Davis.  Lopez and Kuhrt used these fictitious returns to reverse-engineer the bank's financial statements and report investment income that SIBL did not actually earn.  The information in SIBL's financial statements, created and issued by Hewlett & Co., bore no relationship to the actual performance or existence of SIBL's purported investments.   SIBL's financial statements were prepared, drafted, and approved by Hewlett & Co. in conjunction with Stanford, Davis, Lopez and Kuhrt.  As alleged by the SEC and the United States Department of Justice, Stanford and Davis also fraudulently inflated real estate and private equity holdings in SIBL's purported portfolio so the bank could maintain its minimum capital requirements.

### i.     Stanford Financial Group's House of Cards Finally Collapses

67.     In 2008, capital markets seized in a worldwide financial meltdown, and many anxious SIBL investors sought to liquidate their investments.  By October 2008, this depositor

"run" on SIBL had triggered liquidity constraints that frustrated Stanford Financial Group's ability to satisfy client requests for redemptions and funds transfers.  Company records indicate that approximately $2 billion in CDs were redeemed from January 1, 2008 through February 17, 2009.  These redemptions had a huge impact on the ability of Stanford Financial Group's FAs to keep clients pacified, and on Stanford's ability to keep the Ponzi scheme afloat.  As a result, the FAs intensified their efforts to push the CDs on investors to generate new money.

68.     In the wake of the Madoff scandal in January 2009, Venezuelan financial analyst Alex Dalmady examined SIBL's publicly available annual reports as a favor for a friend.  Dalmady concluded that Stanford Financial Group was also an investment Ponzi scheme.  He published his findings in a Venezuelan magazine under the title "Duck Tales."  His findings were then re-published in various blog postings.

69.     On February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Stanford an email, copying David Nanes, that illuminated Stanford Financial Group's crumbling empire:

> [T]hings are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means.  There are real bullets out there with my name on [sic], David's name and many others and they are very real…[w]e are all in this together.

70.     On February 17, 2009, the SEC filed a Complaint against SGC and SIBL, as well as Allen Stanford and Jim Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions."  The SEC obtained an injunction to freeze the assets of Stanford Financial Group, and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial Group companies

71.     On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation, and money laundering.  Former Stanford Financial Group CFO Jim Davis subsequently pled guilty to several crimes, including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding.  On March 6, 2012, Allen Stanford was convicted on multiple criminal counts, including wire fraud, mail fraud, obstruction of an SEC investigation, conspiracy to commit wire and mail fraud, conspiracy to obstruct an SEC investigation, and conspiracy to commit money laundering.

**D.     BDO's Knowing Participation in the Stanford Ponzi Scheme**

72.     BDO USA provided critical services to Stanford Financial Group for over a decade.  For example, BDO USA audited the annual financial statements of SGC, the Texas-based broker/dealer and investment advisor that recommended and sold SIBL CDs to investors.  BDO USA also audited the annual financial statements of STC, which served as trustee and custodian to hold the SIBL CDs that SGC sold for its investors' IRA accounts.  In addition, BDO USA audited the annual financial statements of Stanford Group Holdings ("SGH"), a holding company for the broker/dealer arm of Stanford Financial Group, including SGC and STC.  Notably, BDO USA also provided other *critical* services to SIBL, the offshore bank that issued the CDs.  (Collectively, these clients and BDO USA's other Stanford Financial Group clients, including but not limited to Stanford Capital Management, LLC and Stanford Coins & Bullion, Inc., are referred to as BDO USA's "Stanford Clients").

73.     Despite the pervasive fraud that infected Stanford Financial Group's operations, BDO USA repeatedly issued unqualified audit opinions on its Stanford Clients' annual financial statements.  BDO USA's audit opinions on SGC's financial statements were critical to Stanford Financial Group's success.  SGC was registered with the SEC and numerous state regulators as a

broker-dealer and investment advisor, so SGC *needed* BDO USA's unqualified audit opinions to satisfy securities regulators and to continue recommending and brokering the sale of SIBL CDs. SGC was also a member of the National Association of Securities Dealers, Inc. (NASD), and was registered with the National Futures Association (NFA) and the Commodity Futures Trading Commission (CFTC) as an introducing broker.   As BDO USA's own Independent Auditor's Reports acknowledge, SGC filed its BDO USA-audited annual financial statements with the SEC pursuant to Rule 17a-5 of the Securities Exchange Act of 1934 and Section 1.16 of the Commodity Exchange Act.

> ### a.   BDO's Significant Role In Weakening Antigua's Banking Laws as a Member of the Stanford Task Force

74.   BDO USA's unqualified audit opinions on SGC's annual financial statements were a critical link in the Ponzi scheme's chain, but the most *telling* of BDO USA's services trace back to SIBL's infancy in Antigua.   As discussed above, when Antigua began to suffer increasing scrutiny from foreign regulators, Allen Stanford organized the Stanford Task Force to rewrite Antigua's banking laws.   The Task Force not only succeeded in weakening Antigua's regulatory regime, it strengthened SIBL's footing in Antigua by effectively eliminating SIBL's Antiguan competitors.   More importantly, the Task Force succeeded in making Allen Stanford Antigua's de facto offshore banking regulator, securing a safe haven for the Stanford Ponzi scheme's exponential growth in the years to come.

75.   The smashing success of the Stanford Task Force and its misleading regulatory "reforms" were rooted in its exclusive nine-person membership.   Every firm represented on the Task Force provided crucial services to Stanford Financial Group, and every individual member of the Task Force was personally appointed by Stanford himself, ***including three BDO USA partners***:   (i) Jeffrey G. Balmer, a partner in BDO USA's West Palm Beach, Florida office and

Co-Chair of BDO USA's Florida Practice Financial Services Industry Group; (ii) Keith Ellenburg, an audit partner in BDO USA's Miami, Florida office and member of BDO USA's Financial Institutions Industry Group; and (iii) Barry E. Hersch, another audit partner in BDO USA's Miami, Florida office and partner-in-charge of BDO USA's financial institution clients with domestic and international operations.  Additionally, Michael Ancona, a Managing Senior Associate in BDO USA's New York City office and member of BDO USA's Financial Institutions Consulting Group, also served on the Stanford Task Force.  BDO USA's partners and associates comprised nearly *half* of the Stanford Task Force's members, more than any other firm represented on the Task Force.

76.     A key initiative for the Stanford Task Force — fully known to BDO USA — was to amend Antigua's Money Laundering (Prevention) Act to ensure that *"fraud"* and *"false accounting"* did ***not*** fall under the Act's prescribed list of violations.  BDO USA was charged with some of the most important responsibilities to complete this initiative, including reviewing and advising on Antigua's banking laws, and making recommendations to Antigua's regulatory authorities, including procedures for supervising and examining international banks.  BDO USA's responsibilities also included working jointly with Antigua's Special Advisor to the Prime Minister to: (1) develop an organizational structure for Antigua's regulatory agency; (2) draft regulations and procedures for Antigua's banks; (3) draft procedural manuals and training programs for the Antiguan government and banking personnel; (4) develop an inspection program for Antigua's Minister of Finance; and (5) draft policies and procedures for Antigua's supervision of offshore banks.

77.     The results produced by Stanford's Task Force — and BDO USA's crucial role in achieving those results — is evidenced by the highly critical FinCEN Advisory published by the

U.S. Treasury Department in April 1999.  As discussed above in paragraph 43, the Advisory assailed the Antiguan Government for significantly weakening its banking laws, for vesting regulatory authority with an agency rife with conflicts of interest, and for compromising the independence and effectiveness of its entire regulatory program.

78.     The brazen conflicts of interest that permeated Antigua's new regulator were similar to the conflicts suffered by BDO USA and the other members of Stanford's Task Force. In fact, BDO USA's service on the Task Force completely undermined its independence from Stanford Financial Group, and as a result, BDO USA blatantly violated Generally Accepted Auditing Standards ("GAAS") by issuing unqualified audit opinions on its Stanford Clients' annual financial statements during the years that BDO USA served on the Stanford Task Force.

### b.     BDO Visits SIBL and Examines the Bank's Compliance with Antigua's Newly Weakened Banking Laws

79.     At the same time that BDO USA's partners and associates served on the Stanford Task Force, BDO USA also traveled to Antigua and performed a Policies and Procedures Review of SIBL's operations at Stanford's personal request.  BDO USA's review included meetings with a number of SIBL's bank personnel during the two-week stay in Antigua.  To complete the circle for SIBL and its work on the Stanford Task Force, BDO USA also provided consulting services to Stanford Financial Group in 1999, at Stanford's personal request, to develop examination programs that purportedly ensured SIBL's compliance with the new Antiguan laws and regulations that BDO USA had just weakened.

### c.     BDO Violates Its Independence Requirements Under GAAS

80.     BDO USA's numerous audit failures are equally alarming.  First, as noted above, BDO USA was *not* independent from Stanford Financial Group in 1997 and 1998 as a result of its participation on the Stanford Task Force.  Therefore, BDO USA was prohibited from issuing

*any* audit opinions on its Stanford Clients' annual financial statements during that time.  Under

GAAS, an auditor *cannot* accept an audit engagement or issue an audit opinion on its client's

financial statements unless it is independent of its client at all times.  This mandate requires an

auditor to avoid any relationship with a client that would cause an informed public to doubt the

auditor's independence, and requires the auditor to conduct itself in such a manner that an

informed public would have *no* reason to doubt its independence.

81.    BDO USA violated this independence mandate by issuing audit opinions on

SGC's annual financial statements at the same time that it served on the Stanford Task Force

because:  (i) the Task Force was funded, organized, and appointed by SIBL's sole owner, Allen

Stanford, to purposefully weaken the regulatory regime governing SIBL's lone securities

product, the SIBL CD; and (ii) the very basis for SGC's existence, purpose, and operations as a

broker/dealer and investment adviser was to sell as many SIBL CDs as possible and receive fees

for those sales, while the very basis for STC's existence, purpose, and operations as a trustee and

custodian was to hold as many SIBL CDs as possible in the IRA accounts of Stanford Financial

Group's CD investors.  BDO USA's service on the Stanford Task Force, its failure to follow

professional standards of independence, and its blatant disregard of its conflicts of interest

enabled Stanford Financial Group to sell billions of dollars in SIBL CDs to SGC's clients.

### d.    BDO Actively Conceals Material Information

82.    From at least February 2007 forward, BDO USA's audit engagement partner,

Carlos Ancira, concealed critical, material information from his *own audit engagement team*.

Ancira knew that SGC was under increasing scrutiny from the SEC years before the U.S.

Government seized Stanford Financial Group in February 2009.  Shockingly, however, Ancira

reassured SGC in a February 28, 2007 email that "[d]ue to the sensitivity of the situation," no

other members of BDO USA's audit engagement team would be told about the SEC's

investigation of SGC for possible securities fraud.  Furthermore, Ancira's email permitted SGC's outside legal counsel to omit any discussion of the SEC investigation in its audit response letter. Finally, Ancira noted that "*SGC needs to file its audit report to the **NASD** today* and I would need to speak with [outside counsel] before I approve release of [BDO USA's] opinion in the audit report.  .  .  . Please call me  .  .  . ."  (emphasis added).  Notably, internal email correspondence within SFG suggests that Ancira may have known about the SEC investigation as early as February 2006.

83.  Under Statement on Auditing Standards No. 99 ("SAS 99"), which was partly issued in response to the Enron, WorldCom, and Adelphia scandals, auditors *must* consider potential fraud when auditing a client's financial statements.   In this case, the SEC's investigation of SGC triggered heightened scrutiny under SAS 99, and BDO USA was required to either: (i) adjust the scope of its audits to address a heightened risk of fraud at SGC and expand the scope of its audit testing and analysis of internal controls; or (ii) *possibly resign from the engagement*.   Instead, BDO USA consciously ignored SAS 99 and actively concealed material information from its own audit team "[d]ue to the sensitivity of the situation."

84.  Additionally, BDO USA helped Stanford Financial Group further conceal the SEC investigation by permitting SGC to omit *any* disclosure of that investigation in its audited annual financial statements.  From at least February 2007 forward, BDO USA *knew* the SEC was investigating SGC for very serious allegations of securities fraud.   Yet SGC's 2007 annual financial statements falsely disclose that SGC was merely responding to a "routine compliance and operational audit" conducted by the SEC.  This disclosure is patently false.  It does not inform users of SGC's audited financial statements — including regulators like the NASD, NFA,

and CFTC — that the SEC was investigating SGC for possible securities fraud.[3]  If the SEC's investigation was sufficiently material for BDO USA to conceal that investigation from its own audit team, then certainly it was sufficiently material to require disclosure in SGC's annual financial statements in accordance with applicable securities laws and Generally Accepted Accounting Principles ("GAAP").

> **e.     BDO Fails to Confirm that Stanford Group Company Remitted Investor Funds to Purchase SIBL CDs**

85.     For every year that BDO USA audited SGC's annual financial statements, BDO USA further failed to properly track SGC's client funds to confirm that those funds were in fact remitted to SIBL for the purpose of purchasing SIBL CDs.  According to the Receiver's forensic accountant, Karyl Van Tassel, "SGC customer funds sent by wire transfer and intended to purchase SIBL CDs did *not* go to [SIBL] in Antigua," but instead were "managed by [Stanford Financial Group Company] personnel in the U.S."  The SGC customer funds were simply "routed through bank accounts in the name of [SIBL] and then disbursed by [Stanford Financial Group Company] personnel among [Stanford Financial Group entities], including SGC."

86.     Under GAAS rules governing due professional care, internal controls, and competent evidentiary matter, among others, BDO USA was duty bound to track investor funds obtained by SGC, as a broker/dealer for SIBL CDs, and confirm that investor funds intended to purchase SIBL CDs were in fact transferred to SIBL for that purpose.  If BDO USA met its burden under GAAS to track such funds, then it would have discovered that Stanford and other officers and directors of SGC, as well as officers and directors of SIBL, were diverting and distributing investor funds intended to purchase SIBL CDs to other Stanford entities, allowing those funds to be spent on Allen Stanford's personal lavish lifestyle and allowing those funds to

---

[3] SGC was required to file its audited annual financial statements with the SEC, NASD, NFA, and CFTC.

be used for other improper purposes inconsistent with representations made to investors. BDO USA's failure to meet its burden under GAAS and disregard of its obligation to track such investor funds constitutes another major audit failure, causing billions of dollars in losses to the Stanford entities.

### f.   BDO Fails to Properly Modify Its Audit Opinions

87.   For every year that BDO USA audited the annual financial statements of any Stanford Client, BDO USA continued to issue unqualified audit opinions even though its domestic Stanford Clients almost *never* made any money. In 2007 — the last year that audited financial statements are available — BDO's audit reports show that SGH and SGC sustained annual net operating *losses* of approximately $30 million and $27 million, respectively, and both companies suffered from an accumulated *deficit* of approximately $77 million. Stanford Capital Management, LLC and Stanford Coins & Bullion, Inc. also suffered from accumulated deficits.

88.   BDO USA knew that Allen Stanford had to personally fund millions of dollars in routine capital infusions to keep these companies afloat. Despite these facts, however, BDO USA *never* sought to verify Stanford's personal assets or income, *never* verified SIBL's assets or income (the apparent source of Stanford's supposed wealth), and *never* verified that Allen Stanford was contractually obligated to continue funding these companies. Under SAS 59, BDO USA had to consider its Stanford Clients' ability to continue operations as going concerns, and without any assurance that Stanford had the means and obligations to continue funding these companies, BDO USA was required under SAS 59 to modify its opinions and disclose that there was substantial doubt about the ability of its Stanford Clients to continue as going concerns. Instead, BDO USA repeatedly issued unqualified audit opinions without any such disclosure, evidencing yet another major audit failure that materially and significantly aided the Stanford Ponzi Scheme.

### g.      BDO Fails to Properly Consider and Apply Consolidation Principles

89.      BDO USA also failed to properly consider and apply GAAP guidance governing consolidation for its Stanford Clients' 2003 through 2007 annual financial statements.  Under Financial Accounting Standards Board ("FASB") Interpretation Nos. 46 and 46R ("FIN 46"), BDO USA was required to understand Stanford Financial Group's overall business model and the relationships between its affiliated entities.  The FASB issued FIN 46 in the wake of the Enron scandal to require auditors to understand the "big picture" by considering the substance of relationships among related business entities to determine consolidation for financial reporting purposes.  If BDO USA properly considered and applied FIN 46 when auditing its Stanford Clients, particularly SGC and STC, then BDO USA *knew* that Stanford Financial Group operated as a consolidated business enterprise whose sole purpose was to sell SIBL CDs.  If, on the other hand, BDO USA utterly failed to consider and apply FIN 46 when auditing its Stanford Clients, then BDO USA's willful conduct constitutes another major audit failure.

### h.      BDO Issues Unqualified Audit Opinions Despite its Stanford Clients' Substantial Dependence on SIBL CDs

90.      Despite its institutional knowledge of the Stanford Task Force, Antigua's new banking laws, and SIBL's purported operations in Antigua, BDO USA issued unqualified audit opinions on its Stanford Clients' annual financial statements even though BDO USA knew that its clients' operations were *substantially* dependent upon — if not *entirely* dependent upon —the continuous sale of SIBL CDs.  To illustrate BDO USA's audit failures in this regard, STC generated nearly **70%** of its 2007 operating revenues through referral fees earned from the sale of SIBL CDs by its parent company and controlling shareholder, SGC.  The Louisiana Office of Financial Institutions ("OFI") was so alarmed by STC's dependence upon the sale of SIBL CDs that in July 2008, the OFI ordered STC to essentially stop selling the CDs altogether.

91.     SGC's fate also hinged on selling hundreds of millions of dollars in SIBL CDs. Without the income from such sales, SGC would have been insolvent from at least 2004 forward, and likely before.  Nevertheless, with knowledge of its Stanford Clients' addiction to SIBL CDs and Stanford Financial Group's improprieties, BDO USA continued to issue unqualified audit opinions on SGC's and STC's annual financial statements year after year.  In doing so, BDO USA enabled Stanford Financial Group to sell unregulated SIBL CDs through a safe haven that BDO USA purposefully helped create, and thereby assisted Stanford in the misappropriation of billions of dollars from Stanford Financial Group companies.

### i.      Other Facts Showing BDO's Support of the Stanford Ponzi Scheme

92.     Other facts also illustrate BDO USA's active cooperation and assistance to the Stanford Ponzi scheme.  When Stanford Financial Group's outside counsel solicited international accounting firm KPMG to accept Stanford's two Caribbean airlines as new clients in April 2005, KPMG summarily rejected his proposal on risk-management grounds.  When responding to KPMG's due diligence requests, counsel informed KPMG that Stanford Financial Group's approximately 65 entities, including SIBL and its $4 billion in assets, were directly owned by a single person, Allen Stanford.  Counsel's subsequent offer to meet "off-the-record and informally" with KPMG's personnel and discuss the negative "rumor[s] and innuendo[s]" about his client apparently were not enough to persuade KPMG to accept Stanford Financial Group's airlines as clients.  In contrast, BDO USA had previously accepted the two airlines as clients and audited their annual financial statements from at least 2001 through 2005.

93.     BDO USA's unqualified audit opinions for its Stanford Clients' annual financial statements, combined with BDO USA's service on the Stanford Task Force, its institutional knowledge of SIBL's purported operations in Antigua, its active concealment of material information concerning an SEC investigation, its major audit failures, and its other suspicious

acts demonstrate that BDO USA knew or was aware of Stanford Financial Group's improper activities.   BDO USA's conduct also demonstrates its knowledge that Stanford Financial Group's directors and officers, including the directors and officers of BDO USA's Stanford Clients, were breaching their fiduciary duties to their respective companies within Stanford Financial Group, and that BDO USA knew it was participating in these breaches of fiduciary duties.

**E.      BDO Failed in its Role as the Public Watchdog**

94.      As the United States Supreme Court stated in *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984), independent auditors serve as a public watchdog to protect the public's interests:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to investing public.  This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

The *Arthur Young* opinion is clear that only *independent* accountants may bear this ultimate responsibility to a company's creditors, stockholders, and the investing public.  Independence is the gatekeeper.  Without it, accountants cannot even *serve* as a public watchdog.

95.      BDO USA utterly failed to fulfill its obligations as the public watchdog for Stanford Financial Group, its creditors, and investors.  Because of this failure, Stanford Financial Group continued to sell billions of dollars in SIBL CDs, Allen Stanford and his Ponzi insiders continued to steal billions of dollars from Stanford Financial Group companies, and tens of thousands of innocent CD investors lost their investments.  BDO USA issued unqualified audit opinions for Stanford Financial Group companies when it was explicitly prohibited from even

*serving* as a public watchdog.  In doing so, BDO USA consciously circumvented the professional obligations of independence that it owed to its Stanford Clients and their creditors, including innocent CD investors.  Moreover, in the years that BDO USA was not explicitly prohibited from serving as the public watchdog, the circumstances under which BDO USA issued its unqualified audit opinions demonstrate a conscious betrayal of the public trust.

96.     Stanford Financial Group, aided by BDO USA's services, issued billions of dollars in SIBL CDs to investors but very little of these funds remained.  Instead, Stanford Financial Group's directors, officers, and other managers diverted and distributed substantial sums for their own personal benefit and lost billions of dollars on investments that were inconsistent with Stanford Financial Group's representations to its investors.  Despite the sheer size and volume of this simple shell game, BDO USA consciously refused to lift the veil on the Stanford Ponzi scheme.

97.     BDO USA's cozy relationship with Stanford Financial Group was steeped in conflicts of interest and required ongoing deceptive and duplicitous manipulation of the facts to enable the Ponzi scheme's exponential growth for over a decade.  The result of this deception is the loss of thousands of investors' life savings and the loss of billions of dollars from Stanford Financial Group companies.  While many of the so-called professionals that provided services to Stanford Financial Group were integral to the ongoing fraud, BDO USA's audit and other services for Stanford Financial Group's most critical businesses was the glue that held the scheme together.  If BDO USA had exercised even a minimum level of the independence, inquiry, and professional skepticism required of independent auditors, then it would have revealed the Ponzi scheme many years ago, saving the Stanford Financial Group billions of

dollars in losses that would not otherwise have been incurred and billions of dollars of increased liabilities.

## VI.   STATUTE OF LIMITATIONS DEFENSES

### A.   Discovery Rule / Inquiry Notice / Equitable Tolling

98.   The SEC filed an action against Allen Stanford and SIBL et al. on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiff did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, BDO's participation in the Stanford Ponzi scheme and the true nature of the injury suffered.  Moreover, BDO's wrongful acts were inherently undiscoverable.  Plaintiff also asserts the doctrine of equitable tolling.

## VII.   CAUSES OF ACTION

99.   For each of the following causes of action, Plaintiff incorporates by reference and reasserts the allegations above as if fully set forth below.

### COUNT 1:   Negligence/Gross Negligence

100.   BDO USA owed a duty to its Stanford Clients and Stanford Financial Group, and therefore to the Committee, that required BDO USA to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses. BDO USA's negligent acts or omissions breached that duty to its Stanford Clients and Stanford Financial Group, and therefore to the Committee.  BDO USA's breach of this duty proximately caused an injury to its Stanford Clients and Stanford Financial Group, and therefore to the Committee, by assisting Allen Stanford and his co-conspirators in misappropriating billions of dollars from Stanford Financial Group companies, causing the Stanford Financial Group to suffer billions of dollars of additional losses and causing the Stanford Financial Group to incur billions of dollars of increased liabilities.  As a result of BDO USA's breach, the Stanford Clients

and Stanford Financial Group, and therefore the Committee, suffered billions of dollars in damages.  BDO USA's conduct constituted grossly negligence as that term is defined in Tex.Civ. P. & Rem Code § 41.001.  Accordingly, Plaintiff is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

**COUNT 2:     Aiding, Abetting, or Participation in Breaches of Fiduciary Duties**

101.     The directors and officers of Stanford Financial Group, including but not limited to the Stanford Clients' directors and officers, owed fiduciary duties to their respective member companies within Stanford Financial Group, and therefore owed fiduciary duties to the Committee.  These directors and officers breached their fiduciary duties by causing the Stanford Clients and Stanford Financial Group to engage in an illegal Ponzi scheme that enabled Allen Stanford and his co-conspirators to misappropriate billions of dollars from Stanford Financial Group companies, causing the Stanford Financial Group to suffer billions of dollars of additional losses and causing the Stanford Financial Group to incur billions of dollars of increased liabilities.

102.     BDO USA knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties.  BDO USA knew that the directors and officers of its Stanford Clients and Stanford Financial Group owed fiduciary duties to their respective Stanford companies, and BDO USA was aware that these directors and officers were breaching their fiduciary duties.  BDO USA also knew that it was aiding, abetting, or participating in these breaches of fiduciary duties by the conduct alleged herein.  The directors' and officers' fiduciary breaches and BDO USA's participation in these breaches were a proximate cause of actual damages to the Stanford Clients and Stanford Financial Group, and therefore to the Committee, in the billions of dollars.  BDO USA knew or should have known that its aiding, abetting, or

participation in these breaches of fiduciary duties would result in extraordinary harm to its Stanford Clients and Stanford Financial Group, and therefore to the Committee.  Accordingly, Plaintiff is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

**COUNT 3:      Aiding, Abetting, or Participation in a Fraudulent Scheme**

103.      By its conduct described herein, BDO USA aided, abetted, and/or participated with the various directors and officers of its Stanford Clients and Stanford Financial Group in a fraudulent scheme against its Stanford Clients and Stanford Financial Group, and therefore against the Committee.  In particular, BDO USA's services assisted a fraudulent scheme that further assisted Allen Stanford and his co-conspirators in misappropriating billions of dollars from Stanford Financial Group companies, and therefore from the Committee, causing the Stanford Financial Group to suffer billions of dollars of additional losses and causing the Stanford Financial Group to incur billions of dollars of increased liabilities.  As a result of this conduct, BDO USA is directly liable for fraud, and its actions, in combination with the actions of its Stanford Clients' directors and officers, as well as the various directors and officers of Stanford Financial Group's affiliated member companies, are a proximate cause of actual damages to the Stanford Clients and Stanford Financial Group, and therefore to the Committee, in the billions of dollars.

**COUNT 4:      Aiding, Abetting, or Participation in Fraudulent Transfers**

104.      Plaintiff is entitled to disgorgement of the funds transferred from BDO USA's Stanford Clients, and Stanford Financial Group generally, to third parties because the payments constitute fraudulent transfers under applicable law.  The payments are fraudulent transfers because the Stanford Clients and Stanford Financial Group made the payments to third parties

with actual intent to hinder, delay, or defraud Stanford Financial Group's creditors, and the funds were transferred at a time when Stanford Financial Group and its affiliated member companies, including the Stanford Clients, were insolvent.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."  *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007) (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)).  Additionally, the Stanford Clients and Stanford Financial Group did not receive reasonably equivalent value in exchange for the transfers, and/or any value received was in furtherance of the Ponzi scheme that BDO USA either knew or should have known about and to which it was recklessly and willfully blind.

105.   By its conduct described herein, BDO USA knowingly or recklessly aided, abetted, or participated in these fraudulent transfers to third parties.  BDO USA was aware that its Stanford Clients and Stanford Financial Group were fraudulently transferring assets to third parties, and BDO USA was also aware that it was aiding, abetting, or participating in these fraudulent transfers, and/or was reckless in failing to detect such facts as Stanford's auditor.  The fraudulent transfers and BDO USA's participation in these fraudulent transfers were a proximate cause of actual damages to the Stanford Clients and Stanford Financial Group, and therefore to the Committee.  Therefore, the Committee is entitled to recover from BDO USA the full amount of any fraudulent transfers that third parties received from the Stanford Clients and Stanford Financial Group, either directly or indirectly.  The Committee is also entitled to recover attorneys' fees and costs for its claims against BDO USA.  As a result, the Committee requests reasonable attorneys' fees and costs for prosecuting its fraudulent-transfer claims against BDO USA.

**COUNT 5:     Negligent Retention / Negligent Supervision**

106.     BDO USA is directly liable to the Committee for negligent retention and supervision of its employee, Carlos Ancira.  BDO USA owed a duty to its Stanford Clients and Stanford Financial Group, and therefore to the Committee, to use ordinary care in the hiring, supervision and retention of its agents and employees and in monitoring the activities of its employees in representing the Stanford Clients and Stanford Financial Group.  BDO USA knew or should have known that Carlos Ancira had been specifically retained by the directors and officers of the Stanford Clients and Stanford Financial Group to help Stanford Financial Group conceal its fraudulent activities and thwart regulatory oversight of those activities.  As a result, BDO USA breached the duty it owed to its Stanford Clients and Stanford Financial Group, and therefore to the Committee, by not exercising ordinary care in the hiring, supervision and retention of its employees and in not monitoring its employees' activities with regard to this specific, inherently high-risk, client matter.  BDO USA's breaches of such duties and failures to supervise have proximately caused damages to the Stanford Financial Group companies, and therefore to the Committee, because BDO USA's conduct resulted in the diversion or misappropriation of billions of dollars from the Stanford Financial Group, billions of dollars of losses on investments that were contrary to representations to the investors, and billions of dollars in increased liabilities owed by the Stanford Financial Group companies.

**VIII.   RIGHT OF CONTROL OVER BDO USA AND THE MEMBER FIRMS**

107.     BDO International, BDO Global, and BDO Services had the right to control BDO USA and their other respective Member Firms, including but not limited to the means and details of the Member Firms' work.  For example, during at least part of the relevant period, BDO Global's Articles of Association stated that one object of BDO Global is to "*manage and control*" those other "companies, partnerships and other entities which form part of the

international association of accountants, auditors, tax-advisers and business advisers."

Additionally, BDO USA and other Member Firms provided services to Stanford Financial Group

pursuant to a Member Firm Agreement (the "Member Agreement") with BDO Global that gave

BDO Global the right to control and manage the manner in which these services were provided.

Specifically, in addition to regulating licensing and territorial issues, the Member Agreement

reserved to BDO Global the ultimate ownership and modification of "BDO Technical Manuals"

and "BDO Software" utilized by BDO USA and other Member Firms to conduct their

accounting and auditing business.  The definition of "BDO Technical Manuals" in the Member

Agreement states that these manuals "lay down accounting, auditing, investigation and other

standards and practices to be adhered to by the Member Firm."  Additionally, revisions to such

"manuals, guidelines or instructions" were issued by BDO Global only after approval by BDO

Global's "Policy Board."  BDO Global also provided software, model checklists, model financial

statements, and audit manuals to BDO USA and the other Member Firms within BDO Global's

network of public accounting firms.

108.    BDO Global's Member Agreement also required BDO USA to assure that its

partners and subsidiaries would agree to be *bound* by the Member Agreement, and obligated

BDO USA's partners and employees to: (i) provide professional services at BDO Global's

request; (ii) assist BDO Global in developing accounting products for BDO Global; and (iii)

*comply* with the BDO audit manuals promulgated by BDO Global.  The Member Agreement also

gave BDO Global the right to review BDO USA's management to determine conformance with

the Member Agreement's requirements, and BDO USA agreed to provide all information and

documentation requested by BDO Global in connection with such reviews.  Finally, under

certain circumstances, the Member Agreement also gave BDO Global the right to terminate its Member Agreement with BDO USA or its other Member Firms.

109.    Additionally, the 1999 Annual Report of BDO Global (known as BDO International B.V. at the time) states as follows: (i) "[t]he stringent conditions with which each [M]ember [F]irm has to comply . . . are paramount[;] they not only guarantee that our high standards will be met . . .;" (ii) "[BDO Global] personnel are responsible for . . . implementing international quality control and training programmes;" (iii) [BDO Global's] structure ensures strict quality control;" (iv) we, at [BDO Global] . . . ensure that we consistently provide the highest quality of professional services;" (v) "BDO firms are careful to adhere to strict quality criteria;" and (vi) "[o]ur audits are backed up by extensive experience and expertise and therefore add credibility to a client's financial statements."  BDO Global's 2001 Annual Report also states that its "structure ensures strict quality controls."

110.    Futhermore, BDO International's website states that: (i) BDO International is the "governing entity" of BDO International's network of public accounting firms; (ii) BDO International's network of public accounting firms "is coordinated by [BDO Global];" and (iii) "[s]ervice provision within the international BDO network of independent member firms . . . is coordinated by [BDO Services]."  BDO International's website also states that when its Member Firms "adopt[ed] the single global trading name of 'BDO'" in 2009, BDO would be "entering into arrangements to enable all BDO Member Firms to utilise common IT software which should facilitate the deployment of new network-wide tools and applications," and that "BDO will be introducing a new audit methodology and a new audit process tool to facilitate the consistent delivery of high quality, effective and efficient audits, fully compliant with the International Standards on Auditing (ISAs)."  BDO Global's website has also stated from time to time that "all

member countries are subject to regular practice inspections to ensure these standards are being adhered to."

## IX.   PRINCIPAL / AGENT RELATIONSHIP

111.   A principal/agent relationship existed between BDO International and the various Member Firms within BDO International's network of public accounting firms that provided services to Stanford Financial Group, which was headquartered and controlled in Houston, Texas.  A principal/agent relationship also existed between BDO Global and the various Member Firms within BDO Global's network of public accounting firms that provided services to Stanford Financial Group, which was headquartered and controlled in Houston, Texas.   A principal/agent relationship also existed between BDO Services and the various Member Firms within BDO Services' network of public accounting firms that provided services to Stanford Financial Group, which was headquartered and controlled in Houston, Texas.   Each of the respective Member Firms affiliated with BDO International, BDO Global, and/or BDO Services, including but not limited to BDO USA, BDO Ecuador, BDO Mexico, BDO Peru, and BDO Spain, served as agents for BDO International, BDO Global, and/or BDO Services in providing services to Stanford Financial Group.

112.   As alleged above in paragraphs 107-110, BDO International, BDO Global, and BDO Services had the right to control the Member Firms, and they did so as principals of the Member Firms.   Each of the respective Member Firms who served as agents for BDO International, BDO Global, and/or BDO Services had actual or apparent authority to act on behalf of BDO International, BDO Global, and/or BDO Services as principals.   Each of the respective Member Firms who served as agents for BDO International, BDO Global, and/or BDO Services acted within the course and scope of their authority and agency for BDO International, BDO Global, and/or BDO Services, and acted in furtherance of BDO

International's, BDO Global's, and/or BDO Services' business, when the Member Firms engaged in the wrongful conduct described herein.  As principals, BDO International, BDO Global, and/or BDO Services ratified such wrongful conduct of the Member Firms.  The acts of the Member Firms as agents are attributable to BDO International, BDO Global, and/or BDO Services as principals.

## X.    JOINT ENTERPRISE / SINGLE BUSINESS ENTERPRISE

113.    A joint enterprise or single business enterprise (at least for jurisdictional purposes) existed between BDO International, BDO Global, BDO Services, and their respective Member Firms that provided services to Stanford Financial Group, including but not limited to BDO USA.  BDO International, BDO Global, BDO Services, and their respective Member Firms operate as a joint enterprise or single business enterprise.

114.    All the Member Firms affiliated with BDO International, BDO Global, and/or BDO Services centrally report and share resources and allocate costs across business segments as opposed to individual Member Firm lines.  For example, BDO Global is funded by Member Firms who must pay their pro rata share of costs, as determined through a Cost Memorandum, based upon reserves derived from matters referred by other Member Firms.

115.    There was an express or implied agreement between BDO International, BDO Global, BDO Services, their respective Member Firms, and their respective principals concerning the establishment and administration of the joint enterprise/single business enterprise; a common purpose to be carried out by these various entities and their respective principals, including reaping fees and profits from the illicit activities of the joint enterprise/single business enterprise; a community of pecuniary interest among these various entities and their respective principals; and sharing in the management and direction of the joint enterprise/single business enterprise by these various entities and their respective principals.

116.    Indeed, BDO USA's engagement letters with Stanford Financial Group state that BDO USA may assign its rights to perform services for Stanford Financial Group to any Member Firms of BDO International without Stanford Financial Group's prior consent. Moreover, the Member Firms in the United States, Ecuador, Peru, Mexico, and Spain worked in concert and under the control of BDO USA, BDO International, BDO Global, and/or BDO Services, as alleged above in paragraphs 107-110, to provide audit, tax, consulting, or other professional services to Stanford Financial Group.

117.    Thus, a joint enterprise or single business enterprise existed between and among BDO International, BDO Global, BDO Services, their respective Member Firms, and their respective principals.    Therefore, BDO International, BDO Global, BDO Services, their respective Member Firms, and their respective principals are jointly and severally liable for the fraudulent acts described herein.

## XI.    ALTER EGO

118.    BDO International is directly liable for the acts and omissions of BDO USA and the other Member Firms as described herein because BDO USA and the other Member Firms are the alter ego of BDO International, and a conduit through which BDO International conducted its business, including participation in the Stanford Ponzi Scheme as described herein.  BDO Global is also directly liable for the acts and omissions of BDO USA and the other Member Firms as described herein because BDO USA and the other Member Firms are the alter ego of BDO Global, and a conduit through which BDO Global conducted its business, including participation in the Stanford Ponzi Scheme as described herein.  BDO Services is also directly liable for the acts and omissions of BDO USA and the other Member Firms as described herein because BDO USA and the other Member Firms are the alter ego of BDO Services, and a conduit through

which BDO Services conducted its business, including participation in the Stanford Ponzi Scheme as described herein.

119.    Specifically, BDO International, BDO Global, and/or BDO Services own, control, and/or dominate BDO USA and the other Member Firms to such an extent that BDO USA and the other Member Firms have no separate interests of their own and in reality function as mere divisions, instrumentalities, or branches of BDO International, BDO Global, and/or BDO Services.   For example, as alleged above in paragraphs 107-110, BDO International, BDO Global, and BDO Services had the right to control the Member Firms.  BDO International and all the Member Firms within BDO International's network of public accounting firms, including BDO USA, operate as a single, unified worldwide business unit or single business enterprise, all operating under the BDO International brand, international trademark, trade name, and logo. Additionally, BDO Global and all the Member Firms within BDO Global's network of public accounting firms, including BDO USA, operate as a single, unified worldwide business unit or single business enterprise, all operating under the BDO International brand, international trademark, trade name, and logo.  Additionally, BDO Services and all the Member Firms within BDO Services' network of public accounting firms, including BDO USA, operate as a single, unified worldwide business unit or single business enterprise, all operating under the BDO International brand, international trademark, trade name, and logo.

120.    BDO International, BDO Global, and/or BDO Services control the manner in which their respective Member Firms, such as BDO USA, are perceived by the public, including controlling the Member Firms' use of the BDO International brand name, and therefore BDO International, BDO Global, and/or BDO Services intentionally create the impression in the minds of third parties that BDO International is one unified, global entity that acts as a single unit.

BDO International's own website touts BDO's unified, global services, including BDO's: (i) "seamless service worldwide;" (ii) "continued [efforts] to build [its] international capabilities;" (iii) provision of services "to [BDO] clients in 119 countries;" (iv) "establish[ment] [of] a worldwide structure" in 1988, and consistent use of the BDO acronym for each Member Firm, which "together with the introduction of a new logo and a consistent global brand, clearly demonstrate[s] that the local expertise of [BDO International's Member Firms] [is] combined with the international expertise and strength of [BDO's] international network;" (v) "move to a single global trading name" of "simply BDO" in 2009 to "demonstrate[] [BDO's] commitment to service [its] clients and to compete successfully in [its] market on a multinational basis;" (vi) "easily shared [expertise] across [BDO's] network;" and (vii) "ambition to significantly increase our market share and *ensure that we are recognised in the market as a unified global network*."

121.    As part of BDO International's global branding strategy, BDO International, BDO Global, BDO Services, and their respective Member Firms, including but not limited to BDO USA, operate as a single economic unit.  For all effective purposes, and certainly for purposes of this lawsuit, BDO International, BDO Global, BDO Services, and their respective Member Firms, including but not limited to BDO USA, are one and the same because that is the perception that BDO International, BDO Global, and/or BDO Services seek to create in the minds of third parties worldwide.

## XII.   RESPONDEAT SUPERIOR

122.    BDO USA, BDO International, BDO Global, and BDO Services are liable for the tortious acts of their principals, partners, employees, and agents, including without limitation, Carlos Ancira.  Ancira was acting within the course and scope of his partnership and employment with BDO USA, and in furtherance of the business of BDO USA, BDO

International, BDO Global, and BDO Services, when he engaged in the wrongful conduct described herein.

### XIII.   ACTUAL DAMAGES

123.    The Stanford Financial Group, and this the Committee, has suffered the loss of billions of dollars as a result of the diversion and misappropriation of billions of dollars from the Stanford Financial Group, billions of dollars of losses on investments by the Stanford Financial Group that were contrary to representations made by the Stanford Financial Group to investor regarding how their money would be invested, and billions of dollars of increased liabilities owed by the Stanford Financial Group, all under BDO USA's watch as the auditor.  This loss was proximately caused by BDO USA's wrongful conduct and its conspiracy with Allen Stanford and others as described herein.  Additionally, BDO is liable for all damages caused to the Stanford Clients and Stanford Financial Group companies, and therefore to the Committee, during the time period when BDO USA participated in the conspiracy to conceal the true nature of Stanford Financial Group's activities and evade regulatory scrutiny.  In addition, the Committee is entitled to recover its just and reasonable attorneys' fees, subject to Court approval, for it would be inequitable not to award such fees to the Committee.  The Committee has retained the undersigned attorneys and has agreed to pay them a reasonable attorneys' fee for their work.

### XIV.   PUNITIVE DAMAGES

124.    The Committee's injuries resulted from BDO USA's gross negligence, malice, or actual fraud, which entitles the Committee to exemplary damages in an amount necessary to punish BDO USA, BDO International, BDO Global, and/or BDO Services, and to deter similar conduct by others in the future.

## XV.   CONDITIONS PRECEDENT

125.    All conditions precedent to filing this Complaint have been met.

## XVI.   JURY DEMAND

126.    The Committee demands a trial by jury.

## XVII.  PRAYER

127.    WHEREFORE, the Committee requests that BDO USA, BDO International, BDO Global, and BDO Services be summoned to answer this Complaint, that the case be tried before a jury, and that upon final judgment the Committee recover its damages as alleged herein, including its actual damages, punitive damages, and its costs and expenses of suit, including reasonable attorneys' fees.  The Committee prays for such other relief to which it may be justly entitled.


Dated:  May 12, 2014


                                        Respectfully submitted,

                                        **NELIGAN FOLEY LLP**

                                        By: */s/ Douglas J. Buncher*
                                        Nicholas A. Foley
                                        nfoley@neliganlaw.com
                                        Douglas J. Buncher
                                        dbuncher@neliganlaw.com
                                        John D. Gaither
                                        jgaither@neliganlaw.com
                                        Republic Center
                                        325 N. St. Paul, Suite 3600
                                        Dallas, Texas 75201
                                        Telephone: (214) 840-5320
                                        Facsimile: (214) 840-5301

**CASTILLO SNYDER, P.C.**

By:   */s/  Edward C. Snyder*
      Edward C. Snyder
      esnyder@casnlaw.com
      Jesse R. Castillo
      jcastillo@casnlaw.com
      300 Convent Street, Suite 1020
      San Antonio, Texas  78205
      (210) 630-4200
      (210) 630-4210 (Facsimile)

**STRASBURGER & PRICE, LLP**

By:   */s/  Edward F. Valdespino*
      Edward F. Valdespino
      Texas Bar No. 20424700
      edward.valdespino@strasburger.com
      300 Convent Street, Suite 900
      San Antonio, Texas  78205
      Telephone:  (210) 250-6000
      Facsimile:  (210) 250-6100

**BUTZEL LONG PC**

By:   */s/  Peter D. Morgenstern*
      Peter D. Morgenstern (*admitted pro hac vice*)
      morgenstern@butzel.com
      380 Madison Ave
      22nd Floor
      New York, NY 10017
      (212) 818-1110
      (212) 818-0494 (Facsimile)

*COUNSEL FOR THE OFFICIAL*
*STANFORD INVESTORS COMMITTEE*

## CERTIFICATE OF SERVICE

The foregoing pleading was served via the Court's ecf system on all counsel of record.

*Douglas J. Buncher*